**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0282n.06
Filed: May 20, 2008

**Nos. 06-4426, 07-3928**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| INDIANA MICHIGAN POWER COMPANY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| V. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DEPARTMENT OF |
| UNITED STATES DEPARTMENT OF LABOR, | ) | LABOR ADMINISTRATIVE |
| | ) | REVIEW BOARD |
| Respondent-Appellee, | ) | |
| | ) | |
| V. | ) | |
| | ) | OPINION |
| KENNETH TIPTON, | ) | |
| | ) | |
| Petitioner-Intervenor-Appellant. | ) | |

BEFORE:     COLE and GRIFFIN, Circuit Judges; FORESTER, Senior District Judge.[*]

FORESTER, Senior District Judge.

Petitioner Indiana & Michigan Power Company ("I&M") appeals the order of the

Administrative Review Board ("ARB") for the United States Department of Labor ("DOL") granting

the complaint of its former employee, Kenneth Tipton, and awarding back pay, front pay and

compensatory damages. Tipton's complaint alleged that I&M retaliated against him for engaging

in protected activity in violation of the whistle-blower provision of the Energy Reorganization Act,

---

[*]     The Honorable Karl S. Forester, Senior United States District Judge for the
Eastern District of Kentucky, sitting by designation.

1

("ERA"), 42 U.S.C. § 5851, and its implementing regulations at 29 C.F.R. § 24.

Petitioner-Intervenor Tipton has filed a separate appeal with respect to the amount of front pay awarded to him by the ARB. These two appeals have been consolidated by this Court. Because we conclude that the DOL did not err in finding that Tipton's employment was terminated in violation of the ERA or in awarding and calculating damages to Tipton, we affirm the judgment of the DOL.

**I.**

Tipton was employed by I&M as a test engineer at the Cook Nuclear Power Plant (the "Cook plant") in Bridgman, Michigan from November 1999 until I&M terminated his employment on October 2, 2001. The events leading up to Tipton's termination began in late August 2001, when an unplanned forced outage shut down both nuclear reactor units at the Cook plant. The outage was the result of a significant amount of silt from Lake Michigan entering the plant's Essential Service Water ("ESW") system to the extent that the nuclear reactors could not operate safely.

Once the silt issue was identified and the ESW was cleaned out and repaired, I&M began the required testing of the ESW system. Before the plant could be restarted, the Maintenance Testing Group had to complete an ESW Flow Balance Test, which typically only takes one or two days. Tipton was the day shift test engineer for the Maintenance Testing Group, operating under the direct supervision of Ed Brouwer. Anthony Chacon was the night shift test engineer. Mark Turcotte was a contract engineer supporting the test engineers during the ESW flow test. The Maintenance Manager, Mark Stark, was in charge of the overall supervision of test performance. Although the flow test began on September 18, 2001, a number of unsuccessful attempts to conduct the flow test meant that plant management believed the testing would not be completed until September 25, 2001.

2

As a result, plant management made the decision to work around-the-clock in order to expedite the plant's re-start process, and the test engineers were scheduled to work 12-14 hour days.

In conjunction with its operating license issued by the Nuclear Regulatory Commission ("NRC"), the Cook plant is required to comply with the NRC Policy Statement on Nuclear Power Plant Staff Working Hours ("Generic Letter 82-12") "to prevent situations where fatigue could reduce the ability of operating personnel to keep the reactor in a safe condition. The controls established should assure that, to the extent practicable, personnel are not assigned to shift duties while in a fatigued condition." To comply with Generic Letter 82-12, the Cook plant implemented a Working Hour Limitation policy which provides that the "amount of overtime worked by staff members performing safety-related functions must be limited in accordance with the NRC policy contained in Generic Letter 82-12." Generic Letter 82-12 prohibits, *inter alia*, personnel from working more than 72 hours out of a rolling 7-day time frame without written approval from management. Any deviation from these working hour guidelines should be documented in writing and available for review by the NRC.

During the day of September 25, 2001, Tipton and Turcotte discovered a problem related to the degree of "play" in two of the ESW valves. At the conclusion of his shift that evening, Tipton believed that he had either reached or exceeded the work hour limitations set by the NRC for the previous seven-day period. For that reason, and because he believed the ESW testing was completed and only paperwork remained to be finalized, Tipton informed Chacon, who was coming on for the night shift, that he was going to take the following day off because he was tired and needed to re-set his hours in accordance with the work hour limitations.

During the night shift of September 25, plant management decided to undertake an analysis

3

to determine whether permitting a "plus or minus two turns" tolerance to the hand wheel positions of the ESW valves would solve the "play" problem without deviating from an acceptable flow rate. The analysis was to be prepared as a Design Information Transmittal ("DIT") by I&M's engineering department to be forwarded to the Maintenance Testing Group for incorporation into the Technical Data Book ("TDB"), if justified by the testing. The TDB is a compilation of information used by operations personnel that includes current valve settings. Plant managers charged Chacon with the responsibility of preparing a draft revision for the TDB incorporating the tolerance in anticipation of the DIT, which was due at 11:00 a.m. on September 26.

On the morning of September 26 at approximately 6:30 a.m., Chacon engaged in a "turnover" with Turcotte who was coming in for his morning shift. "Turnover" is the term the Cook plant employees used to describe meetings related to the transfer of shift assignments from one shift to the next so that the work proceeds with continuity. Typically, Chacon and Tipton conducted turnovers "face to face," followed up by an email to the person to whom the assignment was being transferred. At the 6:30 turnover between Chacon and Turcotte, Chacon transferred the responsibility for the TDB revisions to Turcotte both orally and in an email to Turcotte and Brouwer. Tipton, who was not present at the turnover, did not receive this email.

At approximately 7:00 a.m. on September 26, Tipton received a phone call at his home from Brouwer. Turcotte and Chacon were also on the line. Brouwer informed Tipton that he needed to come in to work for a meeting. Tipton requested that Brouwer first verify that he was being required to come in by management since he had exceeded the work hour limitations and he requested that a work hour deviation be approved by management. Approximately five minutes later, Brouwer again called Tipton and confirmed that he needed to come in. Tipton reported to work between 8:00

4

and 8:30 a.m.

Once at work, Tipton again expressed concerns about his excessive hours to Brouwer. Shortly before a 9:00 a.m. meeting, Brouwer presented Stark, the Maintenance Manager, with a written request for an exemption from the 72-hour work hour limitations, which Stark refused to sign. Stark then discouraged Brouwer from presenting the deviation request to Plant Manager Joe Polluck. Stark also ignored Tipton's request during the meeting to sign the approval allowing him to work in excess of the 72 hour limit. Instead, Stark assigned Tipton the task of preparing the paperwork closing out the ESW testing.

Turcotte, charged with finishing Chacon's draft of the TDB, discovered errors needing correction. Stark had instructed Turcotte to complete the TDB by noon. Because the DIT, which was due at 11:00 a.m., was not ready, Turcotte elected to correct the errors in the Chacon draft, have the data reviewed by Tipton and approved by Brouwer, and then he intended to incorporate the DIT into his draft upon receiving it. As requested, Tipton reviewed the data in Chacon's draft for transposition errors, completed his own assignment, and ultimately left the plant at approximately 4:30 p.m. Prior to leaving, Tipton sent an email to Stark again requesting a copy of the authorization allowing him to work in excess of 72 hours.

Because Stark had a noon deadline for the TDB, Turcotte decided to submit the TDB revisions without the DIT tolerances, as approved by Brouwer, to Stark. Stark, unaware that the TDB revisions did not include the DIT, notified management that the tolerances were approved. Thereafter, however, Stark learned that the DIT had not yet been issued, and thus notified plant management that the TDB revisions did not contain the tolerance data. An investigation ensued to determine why the TDB did not incorporate the DIT as originally ordered by management. Tipton

5

and Turcotte were suspended and their access to the Cook plant was turned off on September 27, 2001.

As a result of the investigation, Stark and Donna Kelly, Human Resources Administrator, recommended that Tipton be terminated. I&M terminated Tipton's employment on October 2, 2001, claiming that he failed to follow management's directive to wait for the DIT before issuing the TDB, he lied during the fact-finding investigation, and he had a poor disciplinary history at the plant.

On January 28, 2002, Tipton filed a Complaint with the United States Department of Labor ("DOL") alleging that I&M violated the ERA by suspending his employment on September 27, 2001, and then terminating his employment on October 2, 2001, in retaliation for engaging in protected conduct. Specifically, Tipton alleged that he had been terminated based on conversations and emails on September 26, 2001 wherein he requested a copy of a form he believed had been signed and would authorize him to exceed work hour limitation guidelines mandated by the NRC.

The Occupational Safety and Health Administration investigated Tipton's complaint and issued a recommendation of dismissal on July 11, 2002, which Tipton appealed on July 16, 2002. Then, on December 4, 2002, the NRC advised I&M's parent company that an investigation by its Office of Investigations into Tipton's allegations determined that his complaint was unsubstantiated.

Tipton then requested a hearing pursuant to 29 C.F.R. § 24.4(d)(3). A formal hearing before ALJ Kane was held on July 22-30, 2003. On June 29, 2004, the ALJ issued his Recommended Decision and Order ("RD&O"), finding by a preponderance of the evidence that Tipton had engaged in protected activity that was more than likely a contributing factor to his suspension and termination. Furthermore, the ALJ determined that I&M failed to prove by clear and convincing evidence that its proffered reasons for Tipton's termination were legitimate. In reaching this

6

decision, the ALJ noted that circumstantial evidence combined to provide a preponderance of evidence weighing in Tipton's favor. Considering I&M's proffered reasons for Tipton's termination, the ALJ found these reasons "disingenuous and intentionally polemic." As a result, the ALJ recommended that Tipton be awarded back pay, bonus and pay raise, front pay, attorneys' fees, compensatory damages, the value of lost fringe benefits, and a purging of his personnel file with regard to his termination.

I&M filed a timely petition for review with the ARB. On September 29, 2006, the ARB issued a Final Decision & Order ("FD&O"), adopting the findings and holdings of the ALJ's RD&O in all respects, with the exception of reversing the ALJ's award of $10,744 to cover Tipton's replacement insurance expenses because it constitutes a double recovery. I&M timely filed an appeal with this Court on October 30, 2006 after it had filed a motion for reconsideration with the ARB on October 10, 2006. This Court placed I&M's appeal in abeyance on December 26, 2006, pending the ARB's determination on reconsideration. On June 27, 2007, the ARB granted I&M's motion for reconsideration on the issue of damages and reduced Tipton's award of front pay from $91,038 to $64,350 by calculating the front pay award without including any pay raises or applying a discount rate. Tipton timely filed an appeal with this Court on the front pay issue on July 23, 2007. These appeals were consolidated by the Court on August 6, 2007.

Because the Secretary of the DOL has delegated authority to the ARB to review the ALJ's decision in cases arising under the ERA, the ARB's decision is the DOL's final agency decision. 29 C.F.R. § 24.110(a). This Court has jurisdiction to review the DOL's decision pursuant to 42 U.S.C. § 5851(c)(1).

**II.**

7

**A.     STANDARD OF REVIEW**

The ERA whistleblower provision, 42 U.S.C. § 5851(c), mandates that this Court's review of the final decision of the DOL shall conform to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.  Pursuant to the APA, this Court may reverse the agency's findings and conclusions if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction" or "unsupported by substantial evidence." 5 U.S.C. § 706.  Certainly, this is a highly deferential standard of review, and requires this Court to defer to the inferences that the DOL derives from the evidence.  *Varnadore v. Secretary of Labor*, 141 F.3d 625, 630 (6th Cir. 1998).  Any factual determinations by the Department of Labor "must be affirmed if they are supported by substantial evidence," which is "more than a scintilla, but less than a preponderance, of the evidence." *R.P. Carbone Constr.  Co. v. Occupational Safety & Health Rev. Comm'n*, 166 F.3d 815, 818 (6th Cir. 1998).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *Id*.  Moreover, this court "will not normally disturb the credibility assessments of the Board or an administrative law judge, 'who has observed the demeanor of the witnesses.'" *Litton Microwave Cooking Prods. Div., Litton Sys., Inc. v. NLRB*, 868 F.2d 854, 857 (6th Cir. 1989), *citing NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984)).  Finally, if there is substantial evidence in the record as a whole to support the DOL's conclusions, this Court may not reverse, "even if [the court] could justifiably have made a different choice judging the matter de novo." *NLRB v. Brown-Graves Lumber Co.*, 949 F.2d 194, 196 (6th Cir. 1991).

**B.     THE ENERGY REORGANIZATION ACT**

The ERA prohibits entities licensed by the NRC from retaliating against employees for

reporting and pursuing nuclear safety concerns. 42 U.S.C. § 5851. The ERA itself sets out the burden shifting framework relevant to the analysis of this case. Under the statutory framework, a complainant must first make a "prima facie showing" that retaliation for protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint" in order for the Secretary to investigate. 42 U.S.C. § 5851(b)(3)(A). If the complainant succeeds in setting forth a prima facie case, then the investigation must go forward unless the employer "demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of such behavior." 42 U.S.C. § 5851(b)(3)(B). "For employers, this is a tough standard, and not by accident. Congress appears to have intended that companies in the nuclear industry face a difficult time defending themselves." *Stone & Webster Eng. Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997).

## C.    TIPTON WAS ENGAGED IN PROTECTED ACTIVITY

The first issue for review, then, is whether Tipton was engaged in protected activity when he raised concerns about his excessive work hours and sought to confirm management's authorization for working those hours. The Court reviews the DOL's legal decision that the ERA protected Tipton's activity *de novo*; however, the question of whether Tipton actually engaged in such activity is fact-based, and thus governed by the substantial evidence standard.

To constitute protected activity under the ERA, "an employee's acts must implicate safety definitively and specifically." *American Nuclear Resources., Inc. v. U.S. Department of Labor*, 134 F.3d 1292, 1295 (6th Cir. 1998). I&M argues that Tipton never raised any question about his ability to safely perform his job, but rather only complained about I&M's failure to complete ministerial paperwork.

9

However, the NRC's Generic Letter ties excessive work hours to the potential for fatigue, which directly impacts the safety of the nuclear reactor. The express purpose of the work hour limitations contained in Generic Letter 82-12 is "to prevent situations where fatigue could reduce the ability of operating personnel to keep the reactor in a safe condition." Generic Letter 82-12 specifically provides that normally operating personnel should work an 8-hour day and a 40-hour week while the plant is operating. It permits overtime only when "unforeseen problems require substantial amounts of overtime to be used, or during extended periods of shutdown for refueling, major maintenance or major plant modifications, on a temporary basis. . . ." Any deviation from the work hour limitations should be permitted only for "very unusual circumstances," and any "deviation shall be authorized by the plant manager or his deputy, or higher levels of management." Deviations must then be documented and available for NRC review to enable the NRC to monitor whether plants are abusing the work hour limitations.

The burden of addressing fitness for duty at nuclear plants rests on the NRC licensees, not the employees. *See* 10 C.F.R. § 26. Moreover, the Generic Letter 82-12 places the burden of compliance on the plant, not the employee, by stating that "[a]n individual should not be permitted to work more . . . than 72 hours in any seven day period. . . ." Because the work hour limitations are in place specifically to prevent fatigued workers from impacting the safety of the nuclear reactor, an employee's complaints that his work hours exceed the work hour limitations and his requests for the written authorization for deviation from the work hour limitations certainly impact nuclear safety and thus constitute activity protected by the ERA.

In this case, Tipton notified Brouwer over the telephone on the morning of September 26 that he was over his work hours; nevertheless, Brouwer indicated to Tipton that he was required to report

10

to work that day. Tipton reasonably assumed that the appropriate authorization for deviation from the work hour limitations would be completed by plant management. Once at the plant, Tipton again expressed concern about his hours to Brouwer, who passed these concerns along to Stark. Although Stark's hearing testimony and deposition testimony were inconsistent as to when he learned that Tipton was over on his hours, the ALJ concluded that Stark was aware that Tipton had exceeded the work hour limitations at the 9:00 a.m. meeting. Nevertheless, Stark refused to sign the authorization presented to him by Brouwer, and discouraged Brouwer from pursuing the issue up the chain of command. Stark was, however, aware that Tipton had been assigned additional job duties on that day. Tipton again complained to Stark and other management at the plant before leaving late in the day on September 26 that he had worked excessive hours and that a written authorization was required. Based on Tipton's repeated efforts to notify plant management that he was over his hours and his multiple requests to obtain written authorization for exceeding the work hours limitations, substantial evidence supports the DOL's conclusion that Tipton was engaged in protected activity.

**D.      TIPTON'S PARTICIPATION IN ACTIVITY PROTECTED BY THE ERA WAS A CONTRIBUTING FACTOR IN I&M'S TERMINATION OF HIS EMPLOYMENT**

Once Tipton establishes that he was engaged in protected activity, he must also prove that I&M knew he engaged in protected activity, and that the protected activity was a contributing factor to the "unfavorable personnel action." 42 U.S.C. § 5851(b)(3)(C); *Bartlik v. U.S. Department of Labor*, 73 F.3d 100, 103, n.6. (6th Cir. 1996). There is no dispute that I&M was aware of Tipton's expressed concerns relating to exceeding the work hour limitations or that Tipton's suspension and termination amounted to an "unfavorable personnel action." While there is no direct evidence of

11

retaliatory intent on behalf of I&M, the DOL may rely on circumstantial evidence to infer improper motive. *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985).

A review of the record reveals substantial circumstantial evidence to support a finding that I&M was motivated in part by Tipton's protected activity to suspend and terminate his employment. First, the ALJ relied on I&M's hostility for the NRC work hour limitations as revealed by management's economic decision to work until the ESW Flow Balance Test was complete in order to restart the plant as soon as possible without regard to the excessive hours worked by the test engineers. Stark's refusal to sign the work hours deviation form and the fact that he discouraged Brouwer from pursuing the issue up the chain of command further reveals this hostility, as does the fact that I&M falsified a Condition Report filed on September 28, 2001, indicating that Tipton had been sent home early on September 25, 2001 in an effort to feign compliance with the work hour limitations when in fact he was at work on September 25 and 26, 2001.

Second, the ALJ relied on the mindset of the Cook plant management, notably the pressure to get the plant running as expeditiously as possible notwithstanding the work hour limitations, as further circumstantial evidence of retaliatory intent. Third, the ALJ inferred a retaliatory intent on the part of I&M based on the fact that Tipton's suspension and termination so closely followed his protected activity.

Fourth, the ALJ inferred circumstantial evidence of discriminatory intent based on his determination that I&M's proffered reasons for Tipton's termination were false. Although I&M asserts that it fired Tipton for lying during the fact finding investigation and for his past performance problems, the ALJ considered the testimony of Turcotte, Brouwer, and Chacon and determined that there was no evidence that Tipton lied during the investigation or failed to adhere to the direction

12

of management with regard to the TDB. Moreover, the ALJ found that although Tipton has received four written warnings, two suspensions, and a substandard performance appraisal during his twenty-three month employment at I&M, there was no evidence that he exhibited any unfavorable conduct that would warrant his termination during the period since his last unfavorable action. Thus, the ALJ determined that I&M failed to establish by clear and convincing evidence that Tipton's past performance problems led to the decision to terminate him in spite of his protected activities. Based on I&M's contrived reasons for terminating Tipton, the ALJ determined that this circumstantial evidence supports an inference of discriminatory intent.

Fifth, the ALJ considered the disparate treatment afforded Turcotte, Brouwer, Chacon and Tipton regarding the events of September 26, 2001. Specifically, the ALJ determined that although Turcotte engaged in the same alleged instances of misconduct as Tipton, Tucotte was not disciplined. Also, even though Brouwer played a larger role in regard to the TBD than Tipton, Brouwer was not suspended during the fact finding investigation. Nor was Chacon disciplined, sanctioned, or even suspended despite the fact that his TDB draft contained errors and resulted in the delay. Instead, from the beginning of the fact finding investigation, the ALJ found that the investigation centered only on Tipton despite the fact that the TDB listed Turcotte as the initiator and Brouwer as the approver. Lastly, in inferring discriminatory intent on the part of I&M, the ALJ considered the fact that I&M failed to follow its own progressive disciplinary policy as indicative of an unlawful motive.

The ARB concurred with the ALJ's conclusion that I&M violated the ERA by suspending and terminating Tipton, relying specifically on the fact that I&M's adverse action closely followed Tipton's protected activity and the fact that I&M's proffered reasons for firing Tipton were unsubstantiated. Thus, the ARB concluded that Tipton's protected activity was a contributing factor

13

to the unfavorable personnel action, and that I&M failed to show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of such protected activity. The record certainly contains more than substantial evidence to support the DOL's finding that I&M violated the whistleblower provisions of the ERA by suspending and terminating Tipton.

**E. THE DOL DID NOT ERR IN DECLINING TO MITIGATE I&M'S DAMAGES BASED ON THE ASSERTION THAT TIPTON'S EMPLOYMENT WOULD HAVE BEEN TERMINATED BASED UPON THE DISCOVERY OF "AFTER-ACQUIRED" EVIDENCE**

In an effort to mitigate its damages, I&M argues that Tipton would have been terminated in March 2002 after discovery of personal or objectionable e-mails in his mailbox. Based on the United States Supreme Court's ruling in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), this post hoc evidence of alternative grounds for termination is irrelevant to the determination of whether I&M legitimately terminated Tipton; however, it may be relevant to the issue of damages. The burden is on I&M to "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had know of it at the time of the discharge." *Id*. at 362-63.

In light of the fact that the evidence revealed that other employees at the Cook plant received and/or forwarded the same or similar e-mails, yet were not sanctioned or disciplined, I&M's assertion is tantamount to an acknowledgment that Tipton would have been treated differently than other employees. Thus, I&M cannot establish that it would have terminated Tipton's employment upon the discovery of the prohibited emails. Consequently, substantial evidence supports the DOL's refusal to use this alleged post hoc evidence to mitigate I&M's damages.

**F. THE DOL ACTED WITHIN ITS DISCRETION WHEN IT USED THE "TOTAL OFFSET" METHOD TO CALCULATE THE AMOUNT OF FRONT**

**PAY DUE TO TIPTON**

In his RD & O, the ALJ initially awarded Tipton front pay in the amount of $81,967 plus the 3% [projected salary] increase "in accordance with Complainant's Exhibit 15" outlining his damages. However, Tipton's Exhibit 15 calculates front pay to be $91,038, based on a projected 3% increase in salary for a period of 2 years. Thereafter, on July 2, 2004, the ALJ issued an Erratum and Recommended Order ("E&RO"), effective immediately, which awarded front pay to Tipton in the amount of $91,038, consistent with Tipton's Exhibit 15.

On September 29, 2006, the ARB issued its FD& O affirming all of the ALJ's RD&O and E&RO, with the exception of the replacement insurance expenses which the ARB determined amounted to a double recovery. I&M subsequently filed a motion for reconsideration, arguing that the ARB should have discounted the ALJ's front pay award to present value. On reconsideration, however, the ARB noted that "neither party offered any evidence or testimony before the ALJ in support of an appropriate discount rate to be applied in this case. I&M never raised the issue of discounting the front pay award before the ALJ, and Tipton only alluded to it in his post-hearing brief." Furthermore, with respect to the parties' briefs to the ARB, the ARB noted that "the parties have offered the Board very little guidance for calculating an appropriate front pay award."

As a result, the ARB adopted the total offset approach, whereby courts refrain from calculating future salary increases into the front pay award, thereby obviating the need to discount the award to present value. *See Beaulieu v. Elliott*, 434 P.2d 665, 673 (Alaska 1967). The Sixth Circuit affirmed the use of the total offset approach in *Jackson v. City of Cookeville*, 31 F.3d 1354, 1361 (6th Cir. 1994), where "the rule resulted in a reasonable damage calculation."

Applying the total offset approach in this matter, the ARB multiplied Tipton's I&M salary

of $95,000, before the addition of annual increases and bonuses, by three to yield a three year projected salary of $285,000. Then the ARB added fringe benefits of $94,050 (33% of salary) and bonus pay of $28,500 (10% of base pay), to determine that Tipton's total earnings at I&M would have been $407,550. The ARB then applied the total offset approach to Tipton's earnings at his subsequent employment for three years, resulting in total earnings of $343,200. The difference in what Tipton would have earned at the Cook plant ($407,550) and what Tipton actually earned ($343,200) - $64,350 - equals the amount of front pay the ARB awarded to Tipton.

This Court reviews the DOL's calculation of damages under the abuse of discretion standard. *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 557 (6th Cir. 2006); *United States v. City of Warren, Mich.*, 138 F.3d 1083, 1097 (6th Cir. 1998). While the Sixth Circuit has not mandated application of the total offset approach with respect to front pay, it did find that this approach is appropriate when it provides a "reasonable approximation" of front pay. *See Jackson*, 31 F.3d at 1361. In this case, where the parties disagreed over the proper discount rate and provided very little guidance to the ALJ and ARB on this issue, the DOL acted within its discretion in applying the total offset approach to Tipton's front pay.

**IV.**

For the reasons set forth above, the decision of the DOL is affirmed.