**June M. CARUSO, D.O., Plaintiff,**

v.

**ST. JUDE CHILDREN'S RESEARCH HOSPITAL, INC., a Tennessee corporation, and Children's National Medical Center, Inc., Defendants.**

**No. 01–2643 GV.**

United States District Court,
W.D. Tennessee,
Western Division.

July 9, 2002.

William M. Palmer, Law Offices of William M. Palmer, Boston, MA, June M. Caruso, Boothwyn, PA, Kathleen L. Caldwell, Law Office of Kathleen L. Caldwell, Memphis, TN, for June M. Caruso.

Leo Maurice Bearman, Jr., Baker Donelson Bearman & Caldwell, Memphis,

TN, for St. Jude Children's Research Hosp.

Children's Hosp. of Alabama, Birmingham, AL, pro se.

Children's Health System, Chris Jones, Birmingham, AL, pro se.

## ORDER GRANTING ST. JUDE'S MOTION FOR SUMMARY JUDGMENT

GIBBONS, District Judge.

Plaintiff June M. Caruso commenced this action against St. Jude Children's Hospital ("St.Jude"), her former employer, on August 10, 2001. In her complaint, Caruso asserts state law claims of defamation, outrageous conduct, and retaliatory discharge under Tennessee common law and the Tennessee Public Protection Act ("TPPA"), Tenn.Code Ann. § 50–1–304. On October 23, 2001, St. Jude filed a motion for summary judgment on all of Caruso's claims. On April 30, 2002, Caruso amended her complaint, adding claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203 *et seq.*, the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1221, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215, the False Claims Act, 31 U.S.C. § 3730, the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, and the Tennessee Wrongful Death Statute, T.C.A. § 20–5–106.[1] On May 17, 2002, St. Jude filed a supplemental motion for summary judgment on the claims add-

ed by Caruso in her amended complaint. The court now considers St. Jude's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Caruso was employed in January 2000 as a post-doctoral research associate in the Department of Radiation Oncology, Division of Neuro-oncology at St. Jude under the supervision of Dr. Richard Heideman. (Caruso Aff. at 1; Mirro[2] Aff. at 1.) The position for which Caruso was hired was a one-year training program; she was not employed in a faculty position, nor was she credentialed or granted clinical privileges. Mirro Aff. at 1. All of Caruso's clinical activities were under the direct supervision of the attending physician. *Id.* Mirro avers that Caruso's primary role at St. Jude was as a student in training. *Id.* at 2.

Mirro avers that almost from the beginning of her employment, Caruso constantly criticized all of the physicians and staff at St. Jude for providing what she perceived to be inappropriate medical care. *Id.* Caruso affirms that, almost immediately upon beginning her fellowship, she made repeated complaints regarding what she believed to be the gross medical mistreatment of patients at St. Jude.[3] (Caruso Aff. at 2–3.) Mirro states that Caruso expressed these opinions not only to staff members, but also to patients and families. *Id.* He attests that she repeatedly countermanded attending physician orders and communicated confidential patient information to outside third parties without the knowledge or approval of the attending

---

1. Caruso also added Children's National Medical Center, Inc. as a defendant in her amended complaint.

2. Dr. Joseph Mirro is the Chief Medical Officer at St. Jude, and has served in that capacity at all times relevant to this lawsuit. (Mirro Aff. at 1.)

3. In opposing St. Jude's motion for summary judgment, Caruso alleges several instances of

patient mistreatment by staff members at St. Jude. Since the crux of Caruso's action involves her claims for retaliatory discharge, however, the details of her underlying complaints are not within the scope of the lawsuit. Thus, the court will not set forth the specific details of Caruso's many allegations against St. Jude.

physicians or the families. *Id.* Mirro states that, in one instance, Caruso planned to intentionally induce seizures in a patient without the knowledge or consent of the attending physician. *Id.* He claims that when the pharmacy refused to provide her with the medication necessary to induce the seizures, Caruso responded in a rude, disrespectful, and abusive manner. *Id.* As a result of this incident as well as other complaints lodged against Caruso by staff members, Heideman counseled her in early May 2000 that she must follow institutional policies and attempt to cooperate with the other physicians and staff. *Id.* He warned her that if her inappropriate conduct continued, she would be terminated. *Id.* Caruso asserts that she was threatened with termination in retaliation for her numerous complaints regarding staff members' medical mistreatment of patients and disregard of safety procedures. (Caruso Aff. 3–4.)

Mirro avers that since Caruso's conduct did not improve, on May 25, 2000, Heideman directed her to cease all clinical care unless she was personally supervised by him. *Id.* He also instructed her not to make any direct contact with patients or with their families without his prior knowledge and approval. *Id.* Heideman memorialized this action by a memorandum dated June 1, 2000. *Id.*, Ex. 1. Despite Heideman's instructions, Mirro avers that Heideman subsequently received complaints from patients and parents who were confused and concerned by the conflicting comments they continued to receive from Caruso. *Id.* at 3. On May 31, 2000, Larry Kun, the Chairman of the Radiation Oncology Department, issued Caruso a written warning stating that she must work directly under the supervision of two faculty members, and the attending physician must be present during any counseling sessions with patients, family members, or outside physicians. *Id.*, Ex. 2.

Subsequently, Dr. Robert Stanford, a physician at St. Jude, complained that Caruso had criticized his care of a child to the child's parents. *Id.*, Ex. 3. As a result of this incident, Stanford directed Caruso to have no further contact whatsoever with his patients. *Id.* Mirro avers that, after Caruso had been removed from this patient's care, she went into the patient's room and asked the patient's mother why she did not want her on the case. *Id.* at 3. Mirro states that the patient's mother contacted Heideman and told him that the confrontation with Caruso had hade her very uncomfortable. *Id.* As a result of this incident, on June 2, 2000, Kun gave Caruso a final written warning that she could not contact patients, family members, or outside physicians without the prior knowledge and consent of the treating physician. *Id.*, Ex. 4.

During this same time period, Mirro attests that Caruso was making complaints to him regarding patient care and treatment. *Id.* at 4. In response to her allegations, Mirro sent several of the cases about which she had complained out for independent peer review; in each instance, the care ordered by the St. Jude attending physician was deemed appropriate. *Id.* Mirro attests that Caruso also complained that individuals were altering the medical records. *Id.* Mirro states that he investigated these allegations, but found no evidence to support them; he communicated the results of these investigations to Caruso. *Id.*

On July 31, 2000, Kun and Dr. Joan Chesney, the Director of Academic Programs, met with Caruso and expressed their concern about her refusal to comply with the direct orders of her superiors, her inability to cooperate with others in the program, and her outspoken criticism of the entire faculty. *Id.* They informed Caruso that, upon the recommendation of the

entire faculty, she would have no clinical responsibility for the month of August, and would instead work on her research project. *Id.* Mirro avers that Caruso ignored these directions and continued to attempt to treat several patients. *Id.*

On August 9, 2000, Mirro received a letter from Caruso stating that she had "definitive treatment" for a patient though she would not disclose the diagnosis or the treatment. *Id.*, Ex. 5. Later that day, Caruso sent a message to Mirro stating that she did not plan to put her progress notes in the patient's chart. *Id.* at 5. Mirro avers that, under these circumstances, failure to complete progress notes in a patient's chart is a clear violation of the standard of care. *Id.* In response to Caruso's complaints, Mirro states that he agreed to send this patient to an outside pediatric neurology consultant. *Id.* After she received this information, Caruso wrote to Mirro that "after consultation with her attorney," she would provide him with a diagnosis in strict confidence but that the diagnosis could only be disclosed to the outside consultant and not to anyone on staff at St. Jude. *Id.*, Ex. 6.

On August 11, 2000, Caruso was terminated from her employment at St. Jude. Mirro states that the reasons for her termination were insubordination and disclosure of patient confidential information. *Id.* Specifically, he attests that Caruso had blatantly and repeatedly violated St. Jude policy by sending confidential patient information outside the institution on a regular basis, by refusing to follow instructions regarding her interactions with patients, and by changing senior physician orders regarding the care of patients without notice or consultation. *Id.* at 6, Ex. 7. Caruso contends that she was terminated as a result of her attempts to bring to light the gross medical mistreatment of patients by St. Jude staff members. (Caruso Aff. at 9.)

Following her termination, Caruso, through her counsel, provided to St. Jude "vignettes" setting out twenty-three specific patients to whom she believed St. Jude had provided negligent or improper care. *Id.* at 6, Ex. 8. Mirro avers that, after receiving these vignettes, he sequestered the medical records for these patients and engaged Dr. Bruce Cohen, Director of the Section of Pediatric Neurology at the Cleveland Clinic in Cleveland, Ohio, to conduct an independent peer review on each patient. *Id.* at 6. Mirro states that Cohen was provided with an exact copy of Caruso' vignettes, as well as the entire medical record for each patient. *Id.* He further states that Cohen was not informed of the circumstances surrounding Caruso's termination. *Id.* After conducting his independent peer review, Cohen completed a summary report stating in relevant part:

> Having reviewed these accusations and medical records, I conclude there is no basis for any concern on the part of the staff and administration of SJCRH. Dr. Caruso's insistence that she was correct and the decisions of her superiors were not correct is at the very least naive. The patients receive outstanding medical care as documented in the medical record.

*Id.*, Ex. 10.

Mirro avers that, at no time prior to her termination, did Caruso express her intention to report any activities of St. Jude or its faculty members to any professional, licensing, or regulatory agency. *Id.* at 7. Since her termination, Caruso has contacted several agencies who have conducted investigations regarding the policies and practices at St. Jude, including the Office of Human Research Protection, the Tennessee Board of Medical Examiners, the Dean of the School of Medicine at the University of Tennessee, the Joint Commission on Accreditation of Health Care

Organizations, the Office of Research Integrity, the American Board of Pediatrics, the Child Neurology Society, and the American Board of Psychiatry and Neurology. *Id.* Mirro avers that each of these organizations has concluded its respective investigation and that none has cited St. Jude for any improper patient care or other activity. *Id.*

Following Caruso's termination from St. Jude, Mirro attests that he wrote on two occasions to colleagues at Children's National Medical Center ("CNMC"), Caruso's subsequent employer. He states that the first letter, dated February 7, 2001, was prompted by the fact that Caruso had written an earlier letter to the American Board of Psychiatry and Neurology on CNMC letterhead. *Id.* In his February 7, 2001 letter, Mirro stated that "[t]he purpose of [his] letter is to inquire if Children's National Medical Center had endorsed [Caruso's] action in writing this letter." *Id.* at 8, Ex. 12. The second letter, dated March 2, 2001, was to the Chairman of CNMC's Credentials Committee. *Id.* at 8, Ex. 13. Mirro states that this letter was in response to inquiries initiated by CNMS regarding the credentialing process. *Id.* Mirro avers that neither letter was motivated by malice towards Caruso, and that all information contained in both letters is true to the best of his knowledge. *Id.*

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well

as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986). The moving party can meet this burden, however, by pointing out to the court that the respondents, having had sufficient opportunity for discovery, have no evidence to support an essential element of their case. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing the motion must "do more than simply show that there is some meta-physical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). The district court does not have the duty to search the record for such evidence. *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 110–11 (6th Cir.1989); *Street,* 886 F.2d at 1479–80. Respondents have the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in their favor. *InterRoyal Corp.,* 889 F.2d at 111.

The court first addresses Caruso's claim that she was terminated in retal-

iation for refusing to participate in and/or remain silent about illegal activities being committed by the staff at St. Jude. Tennessee common law protects employees from being discharged for refusing to violate a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision. *Mason v. Seaton*, 942 S.W.2d 470, 475 (Tenn.1997). The Tennessee Public Protection Act ("TPPA"), Tenn.Code Ann. § 50–1–304, extends the common law to protect employees not only from discharge for failing to participate in violations of clear public policy, but also from discharge for refusing to remain silent about such violations in their workplace. *Mason*, 942 S.W.2d at 475. The TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn.Code Ann. § 50–1–304(a). The objective of this act is to remove an employee from a position of having to choose between reporting workplace illegalities to the proper authorities and remaining employed. *Henderson v. Corrs. Corp. of Am.*, 918 F.Supp. 204, 210 (E.D.Tenn.1996) (citing *Merryman v. Cent. Parking Sys., Inc.*, No. 01A01–9203–CH–00076, 1992 WL 330404 (Tenn.Ct.App. Nov.13, 1992)); *see also Mason*, 942 S.W.2d at 475 (stating that the act, commonly known as the "whistleblower" statute, gives an employee freedom to speak out about illegalities in the workplace even though it is "axiomatic that an employer who is engaged in illegal activity does not want that activity reported to those offi-cials who are responsible for enforcing the law.")

▪ To establish a *prima facie* case under the TPPA[4], the plaintiff must show the following four elements: (1) the plaintiff's status as an employee of the defendants; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee. *Hill v. Perrigo of Tenn.*, No. M2000–02452–COA–R3–CV, 2001 WL 694479, at *3 (Tenn.Ct.App. June 21, 2001) (internal citations omitted). Courts have recognized "that the plaintiff has indeed a formidable burden in establishing elements number two and four of the cause of action." *Darnall v. A + Homecare, Inc.*, No. 01–A–01–9807–CV–00347, 1999 WL 346225, at *5 (Tenn.Ct. App. June 2, 1999) (internal citations omitted). Proximity in time between the protected activity and the termination is not sufficient to establish a causal relationship. *Mason*, 942 S.W.2d at 473.

▪ Once the employee has established a *prima facie* case of retaliatory discharge, the burden shifts to the employer to assert a "legitimate, non-pretextual reason for the employee's discharge." *Id.* at *6. If the employer satisfies this burden, the burden shifts back to the employee to prove that the employer's explanation is pretextual. *Id.* In proving pretext, the employee "must present specific admissi-

---

4. To establish a common law claim of retaliatory discharge, the plaintiff must show that the employer violated a clear public policy in discharging an at-will employee. *Robins v. Flagship Airlines, Inc.*, 956 S.W.2d 4, (Tenn. Ct.App.1997) (citing *Chism v. Mid–South Milling Co., Inc.*, 762 S.W.2d 552 (Tenn.1988)). However, Tennessee courts have held that a plaintiff must meet the requirements under the TPPA in order to establish a common law claim of retaliatory discharge, *Guy v. Mut. of Omaha Ins. Co.*, No. W1999–00942–COA–R9–CV, 2001 WL 204485, at *9 (Tenn.Ct.App. July 9, 2001). Thus, the court will analyze Caruso's claims for retaliatory discharge pursuant to the statutory framework.

ble facts, which realistically challenge the defendant's stated reasons." *Id.*

St. Jude contends that Caruso has failed to establish a *prima facie* case under the TPPA because she has not shown an exclusive causal relationship between her alleged whistle-blowing and her termination. The court agrees that Caruso is unable to show that the sole reason for her discharge was her refusal to remain silent about illegal activities at St. Jude. St. Jude has documented various incidents of misconduct, including Caruso's conveyance of confidential patient information outside the institution on a regular basis, her refusal to follow instructions regarding her interactions with patients, and her contravention of orders given by senior physicians regarding the care of patients without notice or consultation, which would warrant her termination. St. Jude has also presented evidence that Caruso was warned verbally and in writing several times that if she did not alter her conduct, she would be terminated. Since the court finds that St. Jude has established that there were reasons other than, or in addition to, Caruso's complaints for her discharge, Caruso has failed to meet the stringent standard of showing that her complaints were the sole reason for her termination. Thus, the court grants St. Jude's motion for summary judgment on Caruso's statutory and common law claims of retaliatory discharge.

■■■ The court now turns to Caruso's state law defamation claim. To establish a *prima facie* case of defamation under Tennessee law, the plaintiff must establish that: (1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to

ascertain the truth of the statement. *Press, Inc., v. Verran,* 569 S.W.2d 435, 442 (Tenn.1978). In opposing St. Jude's motion for summary judgment, Caruso has failed to set forth any specific facts to establish a *prima facie* case of defamation. In support of her argument that the court should not grant summary judgment on her defamation claim, Caruso states only that:

> [t]he Plaintiff will clearly define in a open court room and for the public eye, that both the most highest senior officials of St. Jude, ... clearly and definitively used and abused four specific St. Jude wonderful children to defamate the personal and professional reputations of the Plaintiff and the prior pediatric cancer neurology fellow. This is definitive material basis for fact, and, as stated, a St. Jude child, was manipulated and used as a piece of dirt by both institutions to fire the Plaintiff. There is nothing is this world as disrespectful, as defamatory and outrageous as defaming a human life of a wonderful child in this manner.

(Mem. of Pl. in Supp. of Opp. to Mot. Summ. J. at 10.) Because Caruso has failed to establish any element of a *prima facie* case of defamation, the court grants St. Jude's motion for summary judgment on her defamation claim.

■■■ The court next addresses Caruso's claim for outrageous conduct.[5] Under Tennessee law, a plaintiff must establish three elements to bring a claim for outrageous conduct: "1) the conduct complained of must be intentional or reckless; 2) the conduct must be so outrageous that it is not tolerated by civilized society; and 3) the conduct complained of must result in serious mental injury." *Bain v. Wells,* 936

---

5. In her complaint, Caruso asserts a claim for "outrageous invasion of privacy." Since there exists no such tort under Tennessee law, the court assumes that Caruso intends to bring a claim for outrageous conduct.

S.W.2d 618, 622 (Tenn.1997). The Supreme Court of Tennessee has stated that to determine whether particular conduct is so intolerable as to be tortious, the high threshold standard described in the Restatement (Second) of Torts is applied. *Id.* at 622–23. Pursuant to that approach,

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damage for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Id.* at 623 (quoting *Medlin v. Allied Inv. Co.*, 217 Tenn. 469, 398 S.W.2d 270, 274 (1966) (quoting Restatement (Second) of Torts ("Restatement") § 46 comment (d))).

██ In support of her claim for outrageous conduct, Caruso asserts that St. Jude violated her right to "allow[ ] parents to be rightfully informed when their children have been literally killed, outright murdered by physicians at St. Jude, used and abused for research as guinea pigs." (Mem. in Supp. of Opp. to Mot. for Summ. J. at 11.) The court infers from this language that Caruso contends that the adverse employment actions taken against her, allegedly on account of her complaints regarding the mistreatment of patients by St. Jude staff members, rise to the level of outrageous conduct. However, even assuming that Caruso was disciplined and terminated at least in part because of her complaints regarding patient mistreatment, the court finds that St. Jude's conduct in allegedly discharging Caruso in retaliation for her complaints regarding patient mistreatment fails to constitute conduct so outrageous as to be considered tortious. St. Jude's alleged conduct differs markedly from situations where courts have found extreme and outrageous conduct to be present. *See, e.g., Dunn v. Moto Photo*, 828 S.W.2d 747, 754 (Tenn.Ct. App.1991) (holding that defendants committed a "gross, inexcusable and outrageous breach of a contract" when they accepted plaintiff's film for developing and printing and told plaintiff her film could not be developed when in fact they developed the film and retained one of the prints for display "to friends who desired to see a 'wild picture' "); *Dunbar v. Strimas*, 632 S.W.2d 558, 561 (Tenn.Ct.App. 1981) (holding that summary judgment was inappropriate on plaintiff's claim of intentional infliction of emotional distress when, after examining a nineteen month old baby found dead in its crib, the county medical examiner told the parents the details of his findings indicating the child's sexual abuse and murder, despite knowing that the mother had experienced a nervous breakdown); *Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 140 (Tenn.Ct.App.1975) (affirming the jury's finding that defendant engaged in outrageous conduct when he preserved the body of a premature stillborn infant in a jar of formaldehyde and displayed the jar to the mother). In contrast, St. Jude's conduct in allegedly discharging Caruso because of her complaints regarding patient mistreatment does not rise to the level of "atrocious" or "utterly intolerable" conduct. Thus, St. Jude's motion to dismiss Caruso's claim of intention-

al infliction of emotional distress is granted.

The court now turns to plaintiff's claims under § 1221 of the CSRA. Since the CSRA applies only to a certain class of federal government employees,[6] 5 U.S.C. § 2105, and Caruso has pointed to no facts in the record indicating that she falls into this class, she cannot bring claims pursuant to this statute. Accordingly, the court grants St. Jude's motion for summary judgment on Caruso's claims under the CSRA.

■ The court next addresses Caruso's retaliation claim under Title VII. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove that 1) she engaged in activity protected by Title VII; 2) the defendant knew of her exercise of protected rights; 3) the defendant thereafter took an adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and 4) a causal connection exists between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000). Under the first prong, a plaintiff must show that she engaged in a protected activity. Title VII prohibits an employer from retaliating against an employee who has participated in any manner in any investigation under Title VII or who has opposed any practice by an employer made unlawful under Title VII.[7] 42 U.S.C. § 2000e–3(a). These are known as the participation clause and opposition clause, respectively. *Johnson v. Univ. of Cincinati*, 215 F.3d 561, 578 (6th Cir.2000). In the present case, Caruso has not alleged that she engaged in any activity protected by Title VII pursuant to either the participation or opposition clauses. Since Caruso has failed to establish a *prima facie* case of retaliation under Title VII, the court grants St. Jude's motion for summary judgment on this claim.

■ Caruso also asserts a retaliation claim under § 12203 of the ADA. Section 12203 prevents an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show: "(1) that [s]he engaged in protected activity; (2) that [s]he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 814 (6th Cir.1999) (internal quotation omitted). Similar to her retaliation claim under Title VII, Caruso has failed to present any evidence that she engaged in protected activity under the ADA. Since Caruso has failed to establish a *prima facie* case

**6.** Specifically, § 2105 defines "employee" as an individual who is (1) appointed in the civil service by one of the following officials: the President, a member of Congress, a member of a uniformed service, an individual who is an employee under this section, the head of a Government controlled corporation, or an adjutant general designated by the Secretary concerned under § 709(c) of Title 32; (2) engaged in the performance of a federal function under authority of law or an executive act; and (3) subject to the supervision of an individual named in paragraph one of this subsection while engaged in the performance of her duties.

**7.** 42 U.S.C. § 2000e–3(a) provides in part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

of retaliation under the ADA, the court grants St. Jude's motion for summary judgment on this claim.

[15] The court next addresses Caruso's claim under § 215(a)(3) of the FLSA. Section 215(a)(3) states that it is unlawful for an employer:

> To discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted a proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

Since Caruso provides no evidence that she filed any complaint or instituted any procedure under or related to the FLSA prior to her termination, the court grants St. Jude's motion for summary judgment on Caruso's retaliation claim under the FLSA.

█ Caruso also brings a claim for retaliatory discharge under the NLRA. Section 158(a)(4) of the NLRA provides that it is illegal for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter." Since Caruso does not allege, much less present evidence, that she has ever filed charges or given testimony under the NLRA, the court grants St. Jude's motion for summary judgment on this claim.[8]

The court now turns to Caruso's claim under the False Claims Act. Section 3730(h) of the False Claims Act provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or other in furtherance of an action under the section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

Since Caruso does not point to any evidence in the record showing that she in any way participated in the filing of an action under the False Claims Act, the court grants St. Jude's motion for summary judgment on her claim under the False Claims Act.[9]

█ Finally, the court addresses Caruso's claims under the Tennessee Wrongful Death Statute. Section 20–5–106 provides in relevant part:

> The right of action which a person, who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by the person's death but shall pass to the person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin; or to the person's personal representative, for the benefit of the person's surviving spouse or next of kin; or to the person's natural parents or parent or next of kin if at the time of death decedent was in the custody of the natural parents or parent and had not been legally surrendered or abandoned by them pursuant to any court order removing such person from the custody of such parents or parent; otherwise to the person's legally adoptive parents or parent, or to the

---

8. The court notes that, in opposing St. Jude's motion for summary judgment, Caruso makes no arguments or assertions regarding her NRLA claim.

9. In opposing St. Jude's motion for summary judgment, Caruso makes no arguments in support of her claim under the False Claims Act.

administrator for the use and benefit of the adoptive parents or parent; the funds recovered in either case to be free from the claims of creditors.

In her various filings, Caruso makes many allegations regarding the deaths of several children. However, since Caruso has failed to allege any facts suggesting that she falls within one of the designated categories of persons who may bring a cause of action under the Tennessee Wrongful Death Statute, the court grants St. Jude's motion for summary judgment on her wrongful death claims.[10]

In summary, the court grants St. Jude's motion for summary judgment on all of Caruso's claims.

IT IS SO ORDERED.

---

**10.** Again, in opposing St. Jude's motion for summary judgment, Caruso makes no arguments in support of her wrongful death claims.