NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0969n.06

No. 11-6277

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 31, 2012*

LEONARD GREEN, Clerk

RICHARD RIDDLE, )
)
      Plaintiff-Appellant, )
)
v. )
)
FIRST TENNESSEE BANK, )
NATIONAL ASSOCIATION, )
)
      Defendant-Appellee. )

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

Before: COOK and STRANCH, Circuit Judges, and STAMP, District Judge.[*]

FREDERICK P. STAMP, JR., Senior District Judge. Plaintiff-appellant Richard Riddle ("Riddle") appeals the district court's decision to grant the defendant/appellee's motion for summary judgment. Riddle's complaint, filed on October 28, 2009 in the Chancery Court of Davidson County Tennessee, alleges that First Tennessee Bank terminated his employment in violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and Tennessee common law. Riddle later amended his complaint to add a claim under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A, commonly known as the whistle-blower protection section. Riddle alleged that he was terminated for reporting purported improper cash advances by a bank employee, protesting First Tennessee Bank's refusal to report the violations, and continuing

_____

[*]The Honorable Frederick P. Stamp, Jr., Senior United States District Judge for the Northern District of West Virginia, sitting by designation.

1

to investigate fraudulent activity within the company. First Tennessee Bank maintained that Riddle was fired for a string of performance failures and lack of good judgment he routinely exhibited in conducting his investigations and in his dealing with other employees.

First Tennessee Bank filed a timely notice of removal to the district court, followed by a motion for summary judgment. The district court granted First Tennessee Bank's motion for summary judgment and dismissed Riddle's claims in their entirety. Riddle filed his notice of appeal on October 17, 2011, requesting that this Court reverse the judgment of the district court. We AFFIRM.

## I. BACKGROUND

Riddle began his employment with First Tennessee Bank as a Corporate Security Investigator on July 4, 2006 and worked until his discharge on April 24, 2009. During the majority of his time at First Tennessee Bank, Riddle reported directly to David Scaff ("Scaff"), Investigations Manager. In turn, Scaff reported to Sheila Bramlitt ("Bramlitt"), Corporate Security Manager and head of the Corporate Security Department. Riddle's duties as an investigator included: (1) investigating internal and external events that may result in or have resulted in financial loss to First Tennessee Bank or involve employee wrongdoing; (2) ensuring compliance with regulatory and departmental requirements by reviewing each assigned case for suspicious activity identification and reporting; and (3) ensuring cases are researched, documented, and completed in accordance with departmental, regulatory, and compliance standards.

One of the methods by which First Tennessee Bank is notified of cases requiring investigation is via the filing of an Electronic Incident Report ("EIR"), which is an electronic outlet

used by employees of First Tennessee Bank to report suspicious activity. First Tennessee Bank encourages employees to file EIRs regarding suspicious activity or procedural violations. First Tennessee Bank's Corporate Security Internal Fraud Investigations document ("Investigations Guidelines") sets forth specific steps to be followed during an investigation. The Investigations Guidelines provide that the lead investigator must contact Employee Services prior to interviewing the suspect employee. The Investigations Guidelines also state:

> Before the interviews are conducted, the investigator should notify line management of the interview. As a general rule, the investigator should inform line management two levels up from the suspect employee, but in rare circumstances (i.e. if two levels up is executive management or line management is on vacation) only one level may be suitable.

After the interview, the lead investigator should determine whether to suspend the employee. If line management, Employee Services, and Corporate Security disagree about an employment action, the case should be escalated to the Corporate Security Manager, Employee Services and Compliance/Risk Manager. Upon completion of the investigation, the investigator is required to follow up with the appropriate personnel, which includes Employee Services.

If, as a result of an investigation, the specific case facts dictate that a Suspicious Activity Report ("SAR") is required to be filed with the Financial Crimes Enforcement Network ("FinCEN"), the investigator must complete a SAR form.[1] The criteria for whether activity is reportable via a SAR is set forth in the Suspicious Activity Reporting Procedures Manual, which all investigators are supposed to read every year. The types of suspicious activity that are reportable on a SAR are

---

[1] According to the plaintiff, Bramlitt is the only corporate security employee who can file a SAR with the federal government.

known or suspected insider abuse involving any amount, known or suspected criminal activity with a known suspect and a dollar loss of at least $5,000.00, known or suspected criminal activity with a dollar loss of at least $25,000.00, and known or suspected money laundering with a dollar exposure of at least $5,000.00. First Tennessee Bank's Suspicious Activity Reporting Procedures Section 400 defines insider abuse as follows:

> (1) *Insider abuse involving any amount.* Whenever the national bank detects and known or suspected Federal criminal violation, or pattern of criminal violations, committed or attempted against the bank or involving a transaction or transactions conducted through the bank, where the bank believes it was either an actual or potential victim of a criminal violation, or series of criminal violations, or that the bank was used to facilitate a criminal transaction, and the bank has a substantial basis for identifying one of its directors, officers, employees, agents or other institution-affiliated parties as having committed or aided in the commission of a criminal act, regardless of the amount involved in the violation.

Once an investigator completes a SAR, the SAR is directed to Bramlitt for review. Bramlitt then determines whether the SAR should be filed with FinCEN.

With regard to Riddle's performance as an investigator, Scaff held the opinion that Riddle was an average to below-average performer. Scaff also noted that Riddle had issues with the quality of the documentation of his cases, his conduct, his demeanor, and his treatment of other First Tennessee Bank employees during investigations. Riddle disputes these accusations and asserts that Scaff told him that he "was either on the average, depending on what the particular item was, or exceeded in regards to that item." (Riddle Dep. at 231.) Moreover, Riddle claims that Scaff told him he "was a good investigator," and that he received promotions and raises during his employment with First Tennessee Bank.

4

Purportedly, Scaff first began to question Riddle's investigation tactics in mid-2007, when he observed Riddle inappropriately interject himself into the investigation of Brandi Woodard ("Woodard"). According to Scaff, Riddle used poor judgment in an attempt to mentor Woodard, which resulted in Riddle interfering in Woodard's investigation. Riddle disagrees with this version of events. According to Riddle, Woodard became upset after she received a phone call alerting her that she had been suspended. When Riddle saw Woodard leaving her office crying, he called Scaff to see if he could help Woodard. Riddle alleges that Scaff became upset and told him that he should not have known about Woodard's suspension. Scaff claims that he subsequently spoke to Riddle regarding the Woodard investigation and told him to "back off, stand down, and let us conduct our investigation." (Scaff Dep. at 69.)

In addition to Riddle's alleged inappropriate involvement in the Woodard investigation, Scaff also expressed concerns about Riddle's physical appearance, which he believed to be slovenly and unprofessional. Riddle, however, disputes that Scaff ever directly relayed any such concern to him. On October 1, 2007, at Scaff's direction, Riddle wrote and signed an Individual Action Plan ("IAP") regarding his appearance and his involvement in Woodard's investigation.[2] The IAP included the following language:

> The purpose of the Individual Action Plan is to correct or clarify a perception of impropriety in regards to my personal appearance and/or mannerisms in regards to professional conduct within the corporation.
>
> The first step is recognition and cognizance of appearance and mannerisms . . . .

---

[2]Scaff allegedly advised Riddle that he was instructing all of First Tennessee Bank's investigators to complete IAPs.

The second step is to limit opportunities for criticism . . . . By limiting criticisms against my performance and presence, I will not be providing support for such attacks.

The third step is to allow any cohorts within the department the opportunity to stand independently . . . .

These proposed actions are subject to implementation immediately and I recognize I can and will be held accountable for not acting in the manner proposed by this IAP.

In early 2008, Woodard called Scaff and complained that Riddle was still interfering with her cases– essentially conducting a simultaneous investigation, including calling witnesses. Around this time, Kimi Johnson ("Johnson"), another investigator, also complained to Scaff that Riddle had made her feel uncomfortable during an investigation. Johnson reported that Riddle did not follow proper protocol during the investigation. Riddle counters that he did nothing wrong in the investigation with Johnson.

On or about September 18, 2008, Scaff learned that Riddle had released a video from one of the Corporate Security department's cases to his BUNCO group. According to Riddle, "BUNCO" is "Banks United to Neutralize Criminal Organizations," a professional organization within the banking and law enforcement industries that exists solely to communicate suspected fraud and criminal activities within the banking community. First Tennessee Bank contends that BUNCO is a dice game not affiliated with the bank and that the release of this video of third parties demonstrated a lack of judgment.

In November 2008, James Powell ("Powell"), a Vice President in the Wealth Management Group, called Scaff to complain about an investigation conducted by Riddle. Specifically, Powell

informed Scaff that someone had been looking in his personal account and that Riddle had sent him home on a Friday afternoon to complete an expense report. Powell also sent an email to his supervisor, Chris Kimler ("Kimler"), the head of Wealth Management, stating that he wanted to file a complaint against Riddle due to his unnecessarily heavy-handed investigation. Riddle, however, claims he did precisely as Kimler directed him to do–he closed the issue before Kimler and Powell left for an out-of-town trip the next day. Scaff's investigation of the incident confirmed that there was no fraudulent activity on the part of Powell.

Shortly thereafter, in December 2008, Riddle was assigned to investigate issues regarding the corporate credit card of an employee in the Wealth Management Division, Kevin Clunan ("Clunan"). Kimler was Clunan's immediate supervisor, and Kimler reported to Tripp Thompson ("Thompson"). A regular security audit had revealed that Clunan was making cash advances on his corporate credit card. Prior to interviewing Clunan, Riddle spoke with Kimler and left a voicemail for Thompson explaining that he had to "conduct an interview with one of his employees and [they] would need to discuss it." (Riddle Dep. at 99, 180-81.) Riddle's planned second chair for the interview, Woodard, who was intimately familiar with the case, became unavailable, so Riddle selected Clay Barnett ("Barnett") as his second chair. Before the interview, Riddle discussed the Clunan investigation with Barnett for "about an hour." (Riddle Dep. at 121.) During the interview, Riddle discovered that Clunan had miscoded the purchase of gasoline as a "seminar expense" rather than a "fuel expense." (Riddle Dep. at 122.) Riddle also learned that Clunan had made cash advances on his corporate credit card to purchase gift cards for other bank employees to thank them for providing referrals. Riddle suspended Clunan at the close of the interview on the basis that the

7

cash advances were improper. Despite his attempts, Riddle was unable to reach either Kimler or Thompson following the suspension of Clunan. He did, however, leave voicemails for them informing them of Clunan's suspension.

The day after the Clunan interview, Bramlitt informed Riddle that the purchasing of gift cards as gratuities for employees was an acceptable practice in the Wealth Management Division. However, after Riddle completed the investigation, and because he never saw a Wealth Management policy in writing allowing the purchase of gift cards, he took the position that Clunan had violated the Bank Bribery Act and reported the same to Scaff, Bramlitt, and Paul Hulette ("Hulette"), Employee Services Manager. He conveyed to them his position that a report by First Tennessee Bank to the federal government by way of a SAR was warranted. Bramlitt ultimately told Riddle that the Wealth Management Division had its own rules, including a practice of permitting the giving of gift cards as gratuities to other employees, and that this was a business expense, not insider abuse. Bramlitt then directed that the Clunan case be closed, and Scaff instructed Riddle to close the case as "incident not reportable per stemmed from cultural issue." (Riddle Dep. at 156.) Scaff further instructed Riddle not to bring up the Clunan SAR at the Security Department's weekly meeting where SARs were discussed. Riddle made it clear to Scaff and Bramlitt that he did not agree with First Tennessee Bank's actions and that he was still going to take action as a company employee. However, other than attempt to transfer out of the Corporation Security Department and look for other employment, Riddle did nothing else with regard to the Clunan matter. He did not attempt to meet with Bramlitt's or Hulette's supervisors, he did not attempt to meet with the legal department,

he did not attempt to meet with the president or CEO, he did not call the ethics hotline, he did not contact the federal government, and he did not complete a SAR.

On January 7, 2009, after the Clunan investigation, Scaff issued Riddle a written performance counseling based on his various performance failures during the investigation. Specifically, Scaff noted Riddle's failure to discuss the case with management two levels above Clunan, Riddle's lack of familiarity with the guidelines, including Wealth Management practices, Riddle's lack of communication at all stages of the investigation, and Riddle's poor judgment. Although Scaff later described the Clunan incident as "the straw that broke the camel's back" with regard to Riddle's termination, Riddle claims that Scaff told him that he had to take a written warning on the case, that he needed to "keep [his] head low," and that everything would "blow over." (Scaff Dep. at 215; Riddle Dep. at 302.)

One week prior to Riddle's termination, he began to investigate and research another Wealth Management Division credit card abuse case. Riddle informed Scaff about the new case, and Scaff told him that they would discuss it the following week in person. Subsequently, on April 23, 2009, Riddle told a group of employees during a presentation that filing an EIR was the equivalent of filing a police report. First Tennessee Bank claims this statement was contrary to its policies because it could deter employees from reporting violations and suspicious activity. First Tennessee Bank received an anonymous complaint regarding this misrepresentation via the ethics hotline. After receiving the complaint, Scaff and Bramlitt met with Riddle, at which time he admitted to analogizing the filing of an EIR to the filing a police report. At that point, First Tennessee Bank terminated Riddle's employment, stating that Riddle had consistently failed to use good judgment.

9

Riddle believes he was discharged because of his investigation into and complaints about fraud in the Wealth Management Division. He also states that he received conflicting explanations for his termination.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's decision granting the defendant's motion for summary judgment *de novo*. *Savage v. Gee*, 665 F.3d 732, 737 (6th Cir. 2012). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, this Court must construe the facts and draw all inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The central  issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  Sarbanes-Oxley Claim

Riddle claims that First Tennessee Bank terminated his employment in violation of SOX's whistle-blower protection provision, Section 806, which protects employees who engage in the following specific activities from retaliation:

> (1)  to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by–

(A)  a Federal regulatory or law enforcement agency;

(B)  any Member of Congress or any committee of Congress; or

(C)  a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2)  to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A(a).  "To prevail on a Section 806 claim, a plaintiff must prove that: (1) [he] engaged in a protected activity or conduct; (2) the employer knew or suspected, actually or constructively, that he engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." *Walton v. Nova Info. Sys.*, No. 3:06-CV-292, 2008 WL 1751525, at \*7 (E.D. Tenn. Apr. 11, 2008) (citing *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008)).  Riddle has failed to prove the essential elements of his claim, therefore, we affirm the district court's grant of summary judgment as to the SOX claim.

i.      **Protected Activity**

Riddle's SOX claim is founded upon the allegation that he was terminated because of his actions relating to the Clunan investigation–an investigation based upon his belief that Clunan violated the Bank Bribery Act by improperly giving gift cards to non-Wealth Management employees.  In his response to First Tennessee Bank's motion for summary judgment, Riddle argued, for the first time, that he believed Clunan's actions also violated the bank fraud statute, 18 U.S.C.

11

§ 1344. We find that the district court properly disregarded the bank fraud claim, as it was not alleged in Riddle's amended complaint or his deposition testimony.

Even if we were to consider Riddle's bank fraud argument, it would not change our conclusion that the district court's grant of summary judgment as to Riddle's SOX claim must be affirmed. The bank fraud statute prohibits a person from:

knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice–

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344. In support of his bank fraud claim, Riddle states that through his investigation, he determined that Clunan had: (1) fraudulently obtained bank funds by making advances from the bank's credit card outside of the bank's approved procedures; (2) misrepresented the charged advances as legitimate customer expenses; (3) paid such advances back as kickback to other First Tennessee Bank employees; and (4) did so outside of the bank's payroll procedures. These acts of alleged bank fraud each relate to the cash advances that Clunan made on his corporate credit card to purchase gift cards for other bank employees. Riddle argues on appeal that a reasonable person could conclude that Clunan's scheme was intended to defraud the bank, but based upon Riddle's own representations, it is clear that Clunan did not have the requisite state of mind to be charged with bank fraud. In his deposition, Riddle explained that Clunan believed that it was common practice in Wealth Management to give gift cards as simple thank-yous for business referrals. Thus, Clunan could not have knowingly executed a scheme to defraud the bank by means of false or fraudulent

pretenses, and Riddle could not have possessed a reasonable belief to the contrary. Clunan acted openly and pursuant to his department's regular practices, and Riddle has admitted as much. Therefore, Riddle's argument that he reasonably believed Clunan committed bank fraud cannot support his SOX claim.

We further find that with respect to Riddle's argument that Clunan's actions violated the Bank Bribery Act, the SOX claim fails. In order to receive the whistle-blower protections of SOX, "an employee's complaint must 'definitively and specifically relate' to one of the six enumerated categories found in 18 U.S.C. § 1514A: [mail fraud, wire fraud, bank fraud, securities fraud, any rule or regulation of the SEC, or any provision of federal law relating to fraud against shareholders.]" Allen, 514 F.3d at 476-77. The Bank Bribery Act is noticeably absent from this list, and there is no case law to support Riddle's contention that Section 806 encompasses the Bank Bribery Act.

The only way by which a violation of the Bank Bribery Act could support Riddle's SOX claim is if it could be deemed to fall within the "catch-all" shareholder fraud provision of 18 U.S.C. § 1514A(a)(1). The district court rejected this approach, finding that at its core, the Bank Bribery Act is not a fraud against shareholders. Further, the district court found that Riddle had failed to present any evidence proving that it was Clunan's intent to commit a fraud against the shareholders or that Riddle reasonably believed that it was Clunan's intent to defraud the shareholders. We agree that Clunan's alleged violation of the Bank Bribery Act does not amount to shareholder fraud.

"To have an objectively reasonable belief that there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud." *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009). The elements of a cause

13

of action for securities fraud "typically include a material misrepresentation or omission, scienter, loss, and a causal connection between the misrepresentation or omission and the loss." *Id*. at 56. Thus, the employee must have "an objectively reasonable belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss." Id. In this case, Riddle has failed to show how Clunan's behavior constituted a misrepresentation to the shareholders that resulted in a loss. Riddle's belief that Clunan's gift card practices violated SOX is not itself an objectively reasonable belief that shareholders have been or were likely to be defrauded.

### ii.     Contributing Factor to Termination

Even if Riddle had engaged in protected activity, we find that it was not a contributing factor in his termination from First Tennessee Bank. Riddle contends that the alleged temporal proximity between his claimed protected activity and his termination is sufficient to raise an inference that the protected activity was likely a contributing factor in his termination. But temporal proximity alone is usually insufficient to constitute evidence that would prove that an employer retaliated against an employee for engaging in alleged protected activity. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("[T]emporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim."); *Latosky v. Morrison-Knudsen Corp.*, No. 95-4176, 1996 WL 708346, at *3 (6th Cir. Dec. 5, 1996) ("[T]he mere fact that adverse employment actions occurred after plaintiff engaged in protected activity is insufficient to support an inference of retaliation."). In this case, the last alleged protected activity occurred on January 7, 2009, almost four months prior to the date of Riddle's termination. Even if temporal proximity exists, it is not so strong here to

14

carry the day by itself and no other evidence weighs in favor of finding a causal connection for Riddle's retaliation claim.

### iii.     Termination Regardless of Protected Activity

If a plaintiff can establish the four elements of a Section 806 violation, an employer "may avoid liability if it can prove 'by clear and convincing evidence' that it 'would have taken the same unfavorable personnel action in the absence of that [protected] behavior.'" *Walton v. NOVA Info. Sys.*, No. 3:06-CV-292, 2008 WL 1751525, at *7 (E.D. Tenn. Apr. 11, 2008) (quoting *Allen*, 514 F.3d at 476)). The district court found that First Tennessee Bank met the clear and convincing standard. Throughout his tenure with First Tennessee Bank, Riddle had repeatedly exhibited a lack of judgment, and as a result, First Tennessee Bank received complaints regarding his performance. Riddle even received a written warning in January 2009 which referenced termination. Despite this warning, Riddle continued to exhibit poor judgment, which culminated in yet another complaint being filed about his conduct during the April 23, 2009 presentation. Absent intentional discrimination, this Court cannot sit as a "super personnel department[] to second guess an employer's facially legitimate business decisions." *Adams v. Tennessee Dept. of Finance and Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006). Clearly, First Tennessee Bank decided to end Riddle's employment only after he repeatedly exercised questionable judgment, the incidences of which are well-documented.

Because First Tennessee Bank has offered evidence of a legitimate, nondiscriminatory reason for terminating Riddle, the burden shifts to Riddle to "identify evidence [at summary judgment] from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful

discrimination." *Macy v. Hopkins City Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007), abrogated by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). The ultimate inquiry during the pretext analysis is "did the employer fire the employee for the stated reason, or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination.").

First Tennessee Bank points to particularized facts upon which it relied to show that it "made a reasonably informed and considered decision before taking the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (internal quotation marks omitted). Defeating a properly supported summary judgment motion in these circumstances requires the plaintiff to "produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendants . . . did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. The Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (brackets and internal quotation marks omitted). This, Riddle cannot do. First Tennessee Bank points to supervisors' first-hand observations of Riddle's poor judgment, investigation handling, and appearance, as well as numerous complaints that others lodged against Riddle for similar shortcomings. Although Riddle quibbles with some details surrounding these incidents, none of his arguments undermine the core of the bank's stated reasons for terminating him. Accordingly, a reasonable factfinder could not infer that First Tennessee Bank's stated reasons for terminating him were pretextual.

**C.      Tennessee Common Law Claim**

Tennessee adheres to the doctrine of employment at will, which "recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). "Management has the right to terminate an employee over management and policy decisions, so long as the employer does not violate any clearly established public policy in doing so." *Chism v. Mid-South Milling Co., Inc.*, 762 S.W.2d 552, 555 (Tenn. 1988). In limited circumstances, a public policy exception confers upon employees "implicit rights which must not be circumscribed or chilled by the potential of termination." *Stein*, 945 S.W.2d at 717. To prevail on a claim that he was terminated in violation of the public policy exception to Tennessee's at-will employment doctrine, Riddle must show:

> (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Crews v. Buckman Labs. Int'l*, 78 S.W.3d 852, 862 (Tenn. 2002). Because Riddle cannot establish all of these elements, the district court correctly concluded that his common law claim must fail.

Assuming without deciding that Riddle can show that his termination violated a clear public policy, we find that his retaliatory discharge claim still fails, as Riddle has not shown that the alleged protected activity was a substantial factor in First Tennessee Bank's decision to terminate his employment. As discussed in detail above, Riddle was terminated for his continued inability to

17

exercise good judgment, evidenced in part by numerous complaints. Riddle even admits that his termination was the result of internal politics–that he was the "fall guy" for a market manager's animus toward the Corporate Security Team. Thus, Riddle has also failed to prove the causation element of a common law retaliatory discharge claim.

**D.      TPPA Claim**

The TPPA prohibits an employer from terminating an employee solely because that employee has refused to participate in or remain silent about "illegal activities." Tenn. Code Ann. § 50-1-304(a). Illegal activities include "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code. Ann. § 50-1-304(a)(3). The purpose of the statute "is to remove an employee from a position of having to choose between reporting workplace illegalities to the proper authorities and remaining employed." *Caruso v. St. Judge Children's Research Hosp., Inc.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002). To establish a claim for retaliatory discharge under the TPPA, Riddle must prove: (1) he was an employee of First Tennessee Bank; (2) he refused to participate in or remain silent about illegal activities; (3) he was terminated; and (4) an exclusive causal relationship existed between his refusal to participate in or remain silent about illegal activities and his termination. *Southmayd v. Apria Healthcare, Inc.*, 412 F. Supp. 2d 848, 862 (E.D. Tenn. 2006). Where, as here, there is no evidence that Riddle was specifically instructed to remain silent about illegal activity, Riddle must prove that the implied threat of dismissal if he did not remain silent was real and "not merely the perception of the employee." *Griggs v. Coca-Cola Emps.' Credit Union*, 909 F. Supp. 1059, 1064 (E.D. Tenn. 1995) (internal quotations omitted). This is a formidable

burden, which Riddle cannot meet because: (1) he did not engage in whistle-blowing; and (2) there is no exclusive causal relationship between any alleged or attempted whistle-blowing by Riddle and his termination. Importantly, Riddle only reported the alleged illegal activity to Scaff and Bramlitt–persons whom his job duties required him to make recommendations. Riddle never attempted to escalate his complaints, call the ethics hotline, or contact the federal government. Not only did Riddle fail to file a SAR, but he followed Scaff's instruction to close the Clunan case. The facts show that when his supervisors challenged his assessment of Clunan's alleged fraud, Riddle remained silent–choosing not to push the envelope by reporting the violations himself to FinCEN. As such, Riddle cannot state a whistle-blowing claim under the TPPA.

Even if Riddle could establish the elements of a claim of retaliation under either the TPPA or Tennessee common law, First Tennessee Bank would still be entitled to summary judgment because it had a legitimate, non-retaliatory reason for terminating Riddle–his continued lack of judgment, which culminated in his misinforming employees about EIRs. "Once a plaintiff has made out a prima facie case, 'the burden shifts to the employer to advance a non-discriminatory reason for the termination.' The burden then shifts back to the plaintiff 'to show that his termination was solely for the reasons which he initially alleged.'" *Sacks v. Jones Printing Co., Inc.*, No. 1:05-CV-131, 2006 WL 686874, at *4 (E.D. Tenn. Mar. 16, 2006) (quoting *Hill v. Perrigo of Tennessee*, No. M2000-02452-COA-R3-CV, 2001 WL 694479, at *4 (Tenn. Ct. App. June 21, 2001)). "The employee faces summary dismissal of his claims if he is unable to demonstrate that he could prove that the defendant's reason for the discharge was pretexual. Thus, if the employee fails to make the required showing of pretext, the employer must prevail." *Hill*, 2001 WL 694479, at *4 (quoting

19

*Robinson v. Nissan Motor Mfg. Corp.*, No. M1999-00296-COA-R3-CV, 2000 WL 320677, at *5-6 (Tenn. Ct. App. Mar. 26, 2000)). "When the burden shifts to the employee to show pretext, he must show the reason advanced by the employer is a phony reason for some action. Moreover, this showing must consist of more than conclusory statements by the employee. The subjective interpretation by the employee of the actions of the employer will not create an issue of fact to defeat summary judgment." *Id*. at *7 (internal quotations and citations omitted). Moreover, Riddle cannot show pretext by merely disagreeing with documented concerns or by showing that these reasons represent only questionable justification for discharge. *Irvin*, 837 F.2d at 726.

Riddle cannot point to any evidence suggesting that First Tennessee Bank's explanation for his discharge is based on anything other than its stated reasons. Importantly, Riddle's own testimony is detrimental to any claim that his termination was related to the Clunan investigation, as he has testified that he thinks that the "real" reason he was terminated was because Tony Thompson had "bad blood" with Corporate Security. Because Riddle's own deposition testimony rebuts his claim of retaliation, we find that he has failed to meet his burden of demonstrating causation under the common law and the TPPA.

For the foregoing reasons, we AFFIRM the district court's granting of defendant's motion for summary judgment.