RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MICHAEL RHINEHIMER,

  *Plaintiff-Appellee,*

  *v.*

U.S. BANCORP INVESTMENTS, INC.,

  *Defendant-Appellant.*

No. 13-6641

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:11-cv-00136—William O. Bertelsman, District Judge.

Argued:  November 21, 2014

Decided and Filed:  May 28, 2015

Before:  DAUGHTREY, MOORE, and CLAY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Gregory Parker Rogers, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant.  Lynn D. Pundzak, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Gregory Parker Rogers, Aisha H. Monem, TAFT, STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellant.  Lynn D. Pundzak, Cincinnati, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

    CLAY, Circuit Judge.  Defendant U.S. Bancorp Investments, Inc. ("Defendant" or "USBII") appeals from judgment following a jury trial on Plaintiff Michael Rhinehimer's claim that he was disciplined and fired in retaliation for his complaint about fraud perpetrated on USBII customer Norbert Purcell, in violation of the Sarbanes–Oxley Act, 18 U.S.C. § 1514A.

1

The only issue on appeal is whether Plaintiff established that he engaged in activity protected by § 1514A(a)(1). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

Plaintiff filed his complaint in the instant action in 2011, alleging a single count of retaliation in violation of the Sarbanes–Oxley Act. The case was tried to a jury over five days in 2013. At trial, Plaintiff presented evidence that he was disciplined and fired in retaliation for an email he sent alerting one of his superiors to unsuitable trades made by a co-worker, Patrick Harrigan, to the detriment of Plaintiff's elderly client, Norbert Purcell. The trades, which are undisputed, occurred while Plaintiff was on disability leave. Plaintiff learned of the trades from his personal assistant shortly after they were made. He called his immediate supervisor twice to express concern about the trades, and finally wrote an email to his supervising principal, criticizing the trades for "destroy[ing]" Purcell's estate plan and asserting that the trades should never have been placed or approved. Upon returning, Plaintiff was specifically reprimanded for his email. His superiors also threatened his job, placed him on an aggressive "performance improvement plan," and fired him when he ultimately failed to meet the plan goals.

The jury returned a verdict for Plaintiff and awarded damages for economic loss and emotional damages. Via special verdict form, the jury specifically found (1) that Plaintiff "proved by a preponderance of the evidence that, at the time of the complaint, he had an objectively reasonable belief that Mr. Harrigan had committed unsuitability fraud;" (2) that Plaintiff "further proved, by a preponderance of the evidence, that [Plaintiff's] email was a contributing factor in his termination;" and (3) that Defendant did not prove "by clear and convincing evidence that it would have discharged [Plaintiff] even if he had not sent the email." (R. 114, Special Verdict Form, PGID 3850-51.)

### A.       Plaintiff's Employment at U.S. Bancorp Investments and His Knowledge Regarding Norbert Purcell

Plaintiff is a certified financial planner. He testified at trial that he had about twenty years of experience in financial consulting. Plaintiff testified that certification as a financial planner requires approximately three to five years of professional experience and three years of study on topics like insurance, investment, taxes, and estate planning, followed by a rigorous

exam. Following the initial certification, a financial planner must adhere to certain ethical standards and engage in continuing education. Plaintiff was certified as a financial planner in 1999, and in 2005 he earned a charter financial consultant designation.

Plaintiff worked at USBII and a predecessor bank for eleven years as a financial advisor. In that capacity, he was assigned a territory covering four offices in Kentucky. Through his work at USBII, Plaintiff became acquainted with an elderly gentleman named Norbert Purcell. Plaintiff met Purcell early in his time with USBII through his work as a financial advisor for Purcell's brother. Plaintiff testified at trial that he and Purcell became friends over time. All of Purcell's assets were in a trust at the bank. Plaintiff described Purcell as a conservative investor who favored cash-like instruments.

Plaintiff testified that Purcell discussed estate planning with Plaintiff. The beneficiaries of Purcell's trust included his alma mater and his preferred charity. Purcell told Plaintiff that he wanted to leave some money for family members, and they discussed the need to set up an account solely in his name to fulfill those wishes. Plaintiff testified that they discussed this issue repeatedly over their ten year acquaintance. Plaintiff also testified that he observed Purcell's faculties decline over the decade he knew him:

> He was elderly when we first met. I would imagine the mid 80s when I met him. And he was pretty sharp. But as time goes by, I would notice that he would ask me the same things at multiple meetings or we discussed at the last meeting.
>
> You know, you could just tell that – he was in his mid 90s by this point, and he just, you know, was not nearly as sharp or cognizant of the things as he used to be. He was deteriorating.

(R. 126, Rhinehimer Tr. Test., PGID at 4050-51.)

Plaintiff testified that their discussions about Purcell's desire to leave money for his family "came to a head" in 2009, as Plaintiff was preparing to take disability leave. (*Id.* at 4051.) The two men discussed available options, and Plaintiff opened a brokerage account in Purcell's name so that he would have assets apart from the trust. Plaintiff linked the account in Purcell's name to the trust so that purchases in the brokerage account would be paid for by the trust, and any interest or sale proceeds from the brokerage account would return to the trust.

Plaintiff testified that he and Purcell decided to remove a "relatively small" portion of the trust assets, $465,000, and invest it through the brokerage account in Purcell's name. (*Id.* at 4052.) Plaintiff purchased a TransAmerica short term bond fund for Purcell. Due to the recession, the bond fund had lowered its "break point"—the point at which a buyer was not charged for purchasing shares—from one million dollars to $250,000. The shares he bought were "A shares," which had a low operating expense at a quarter of one percent. The purchase was made on October 30, 2009.

### B.        Plaintiff's Disability Leave and Communications with Patrick Harrigan

Plaintiff went on disability leave the first week of November 2009 and remained on leave, with the exception of a brief two week period in March, until August 2010. While he was on leave, he stayed in touch with his personal assistant, his immediate supervisor and his supervising principal (Jeff Harper and Susan Gattermeyer, respectively), as well as some other colleagues.

One of the other colleagues that Plaintiff reportedly spoke with was Patrick Harrigan, another USBII financial advisor. According to Plaintiff, Harrigan contacted him to let him know that he was covering the Cold Springs branch in Plaintiff's absence and to ask if there was anything in particular Harrigan should know. Plaintiff testified:

> I told him that my assistant, Becky Smith, was handling most of the day-to-day operations, stuff like that, but I did have one particular client, Norbert Purcell, who was very elderly, diminished capacity, had a lot of money in a trust in cash that the bank was wanting to have invested to produce revenue. And I informed Pat that his estate plans were long and thought out, I'd known him for over ten years; and I asked him not to do any transactions with Mr. Purcell, due to his advanced age and his declining facilities.

(R. 128, Rhinehimer Tr. Test., PGID. at 4106-07.)[1]

### C.        Plaintiff's Knowledge of the Trades and Email to Susan Gattermeyer

Plaintiff's assistant, Becky Smith, called Plaintiff shortly after his conversation with Harrigan and informed him that there had been trades on Purcell's account. She informed him

---

[1]Although there is some dispute about whether the two men actually spoke, the record does not preclude a finding that this conversation in fact occurred.

that Harrigan purchased $250,000 worth of a certain LDLAX fund for Purcell. The purchase was made on May 5, 2010. Plaintiff testified that this purchase was a short term bond fund similar to the TransAmerica fund he had purchased for Purcell, but that the trade was more costly for a number of reasons—because it was in a different family, because the shares purchased were C-Shares (which had a higher operating expense), and because it had a higher "break point." The trade was also inconsistent with Purcell's estate plans, as Plaintiff understood them, because it took money out of the trust. Plaintiff also testified that the trade placed by Harrigan resulted in significantly more compensation to the firm and to the broker than the trade he had placed for Purcell the previous year.

After learning about the May 5, 2010 purchase from Becky Smith, Plaintiff called his direct supervisor, Jeff Harper and "let him know that [he] felt there was a situation that had developed or was developing between Mr. Harrigan and Mr. Purcell that [he] thought was unsuitable and could reflect poorly on everyone involved." (*Id.* at 4111.) Jeff Harper told Plaintiff to stay out of it.

Soon after, Plaintiff again heard from Becky Smith about a second trade placed by Harrigan for Purcell. The trade withdrew $650,000 from the trust and invested it through the brokerage account in a TransAmerica fund that Plaintiff described as "another leg up on the risk scale." (*Id.* at 4143.) Plaintiff explained why the trade caused him concern:

> I did not agree with that purchase either, for the same reasons I just recounted. You're depriving one group of people and enriching another. Now you've went from being in a short-term conservative fund to something that has stocks in it. And this is all overlaying Mr. Purcell with 95 years old, and these are intricate math problems and estate problems, and I don't think he appreciated the ramifications that was going on.

(*Id.*) Plaintiff immediately called Jeff Harper to express concerns about this trade. He testified that Harper "reminded" him that "[he] was out on medical disability and [he] should stay out of this matter." (*Id.* at 4144.) On May 28, 2010, Plaintiff sent the following email to Susan Gattermeyer, who was his supervising principal:

> I'm sure you know how upset I am over pat h totally disregarding our agreement to leave Norbert [Purcell] alone, not only did he not, he did it behind mine & Becky's back….

in doing so he destroyed his estate plan…. Norbert now has over 1.5 million exposed to probate. the brokerage account ( which is under my rep code as are the worthless, innappropriate [sic] trades that has [sic] lost 30 or 40 k in seven days) needs to be tod [transfer on death] to trust or re-registered to trust.

pat is untrained, uneducated, irresponsible [sic] & careless….

please keep this between us……. those trades should have NEVER been placed let alone approved.

(R. 127 at 4161-66; PX 37; R. 46, Rhinehimer Dep. Ex. 35.)

### D.      Retaliation

Three days after Plaintiff returned from disability leave in August 2010, he was given a written warning by Jeff Harper and Susan Gattermeyer. Plaintiff testified that when they met with him about the warning, Harper and Gattermeyer "let [him] know that they were there on a very, very serious matter, and [his] e-mail . . . had prompted a FINRA investigation . . . and anybody associated with this was really feeling the heat." (R. 128, Rhinehimer Trial Test. 4182.) Defendant describes the warning as based on the unprofessional language used in the email to describe Harrigan.

On October 6, 2010, Plaintiff was called out of a company meeting and into the office of his new supervisor, Sukh Sandhu, together with Division Manager John Eckman. Both Plaintiff and Sandhu testified that Eckman locked the office door, inquired whether Plaintiff liked his job, and asked if he had consulted an attorney. Plaintiff also testified that Eckman asked him about Norbert Purcell and whether Plaintiff was aware of the FINRA investigation. After Plaintiff admitted that he had contacted an attorney, Eckman told him that his career at USBII was over, and that if he sued the bank his career in the city would be over.

Shortly afterwards, Plaintiff was placed on a performance improvement plan that required him to increase his revenue to $40,000 per month. Plaintiff did not meet that goal, and he was fired on January 11, 2011.

**DISCUSSION**

***Standard of Review***

We review *de novo* a district court's denial of a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). Judgment on the motion may only be granted where, "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Id.* "The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury." *Balsley v. FLP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir. 1997)).

***Analysis***

The Sarbanes–Oxley Act makes it illegal for publicly traded companies to retaliate against an employee who reports suspected fraud, or who assists in a fraud investigation or enforcement proceeding. 18 U.S.C. § 1514A. Prior to 2010, employees complaining of retaliation were required to submit their claims to the Secretary of Labor for administrative adjudication.[2] *See* § 1514A(b). The 2010 Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank") created a private right of action allowing employees who believe they have been retaliated against for engaging in protected activity under § 1514A to file suit directly in federal court. 15 U.S.C. §§ 78u-6(h)(1)(A)(iii) and (B)(i); *see also Khazin v. TD Ameritrade Holding Corp.*, 773 F.3d 488, 491 (3d Cir. 2014) (discussing the Dodd–Frank and Sarbanes–Oxley causes of action).

Whistleblower claims alleging a violation of § 1514A are subject to a burden-shifting framework. *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339, 344 (4th Cir. 2014). First, the plaintiff must establish a prima facie case by proving, under a preponderance of the

---

[2]Under the Sarbanes–Oxley scheme, an employee may bring a *de novo* action at law or equity in federal court if the Secretary fails to issue a final decision within a certain period—90 days, prior to 2010, and 180 under the Dodd–Frank amendments to § 1514A. *See* Pub. L. 111-203, Title IX § 922(c).

evidence standard, that (1) he engaged in protected activity; (2) the employer knew or suspected, either actually or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action. *Id.*; *Riddle v. First Tenn. Bank, Nat'l Assoc.*, 497 F. App'x 588, 594 (6th Cir. 2012). The employer may then avoid liability if it proves "by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity." *Feldman*, 752 F.3d at 345. (quoting *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2014)).

The sole issue on appeal is whether the jury could find that Plaintiff engaged in protected activity under § 1514A. Resolving this issue requires us to first determine the appropriate legal standard in this evolving area of law.

## I.          Legal Standard for Protected Activity

In the language of the statute, protected activity under § 1514A includes "any lawful act done by the employee" to provide information to a supervisor (as relevant here) regarding

> any conduct *which the employee reasonably believes* constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders[.]

18 U.S.C. § 1514A(a)(1) (emphasis added). The parties agree that most aspects of this definition of protected activity were satisfied by the evidence at trial. "Unsuitability fraud," the accusation Plaintiff levels against USBII in connection with the May 2010 trades for Norbert Purcell, "is a type of section 10(b) fraud claim." *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 848 (6th Cir. 2007) (referring to Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and the accompanying regulation promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5). Providing information to a supervisor regarding suspected unsuitability fraud thus qualifies as protected activity under the statute so long as the reasonable belief requirement is met. *See* § 1514A(a)(1).

Defendant contends on appeal that the evidence did not support a finding that Plaintiff could have had an objectively reasonable belief that Harrigan's conduct constituted unsuitability

fraud. Defendant argues that to satisfy the reasonable belief standard, Plaintiff was required to establish facts from which a reasonable person could infer each of the elements of an unsuitability fraud claim, including the misrepresentation or omission of material facts, and that the broker acted with intent or reckless disregard for the client's needs.[3] Def.'s Br. at 22-25. This argument is based on this Circuit's unpublished decision in *Riddle v. First Tennessee Bank, National Association*, 497 F. App'x 588 (6th Cir. 2012) adopting the standard that under § 1514A an employee's complaint "must definitively and specifically relate to one of the six enumerated categories" of fraud by "approximat[ing] the basic elements" of the fraud claim. 497 F. App'x at 595 (citations omitted).

The district court accepted Defendant's statement of the legal standard and instructed the jury that Plaintiff must show that he had "an objectively reasonable belief" that each of the elements of unsuitability fraud "existed in connection with the sale by Mr. Harrigan to Mr. Purcell." (R. 114, Jury Instructions, PGID 3844-45.) Plaintiff unsuccessfully argued for a lower standard, citing jurisprudential developments that we will shortly discuss in depth. On appeal, Defendant argues that Plaintiff cannot show he had adequate information to form a reasonable belief that USBII intentionally or with reckless disregard misrepresented or omitted material facts in its communications with Purcell about the trades.

For the reasons discussed below, we reject the "definitively and specifically" standard recited in *Riddle* as inconsistent with § 1514A and the statutory scheme, and we adopt the emerging rule that the employee's reasonable belief is a simple factual question requiring no subset of findings that the employee had a justifiable belief as to each of the legally-defined elements of the suspected fraud. *See Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 220-21 (2d Cir. 2014); *Weist v. Lynch*, 710 F.3d 121, 131 (3rd Cir. 2013). Although Plaintiff does not renew his challenge to the "definitively and specifically" standard on appeal, because we must identify and apply the correct legal standard, we nonetheless address it. Courts "are not bound to

---

[3]In essence, unsuitability fraud occurs where a broker knows or reasonably believes certain securities to be unsuitable to a client's needs, but recommends them anyway. *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 849 (6th Cir. 2007). Unsuitability is judged with regard to the client's investment objectives; "a mechanical comparison of costs" is not dispositive. *Id.* To be actionable, the broker must have either made material misrepresentations about the transaction, or, owing a duty, failed to disclose material information. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1032 (4th Cir. 1997). *Robert N. Clemens Trust*, 485 F.3d at 849. Reckless disregard of the investor's interests satisfies the scienter requirement. *Id.*

accept[,] as controlling, stipulations as to questions of law," and we decline to rely on the parties' stipulation to a standard that has elsewhere been called into significant doubt. *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002) (citation omitted); *see also Young v. United States*, 315 U.S. 257, 259 (1942) ("[O]ur judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties.").

### A.          The Rise and Fall of the "Definitively and Specifically" Standard

The "definitively and specifically" standard was introduced into the adjudication of Sarbanes-Oxley whistleblower claims by the Administrative Review Board of the U.S. Department of Labor ("ARB") in a case named *Platone v. FLYi, Inc.*, ARB Case No. 04-154, 2006 WL 3246910 (ARB Sept. 29, 2006), *aff'd sub nom. Platone v. U.S. Dep't of Labor*, 548 F.3d 322 (4th Cir. 2008). In *Platone*, the ARB held that "the employee's communications must 'definitively and specifically' relate to any of the listed categories of fraud or securities violations under 18 U.S.C.A. § 1514A(a)(1)." *Platone*, 2006 WL 3246910 at *8. The ARB concluded that Platone did not meet this standard because her "revelations" to her supervisors "[did] not even approximate any of the basic elements of a claim of securities fraud – a material misrepresentation (or omission), scienter, a connection with the purchase, or sale of a security, reliance, economic loss, and loss causation." *Id.* at *11. For example, the ARB noted that the employee only testified to losses of less than $1,500, and found it "unlikely that a reasonable shareholder would find a loss of less than $1,500.00 material." *Id.* Accordingly, *Platone* stands for two propositions: first, that a whistleblower's complaint must "definitively and specifically" relate to an enumerated legal violation to qualify for protection; and second, that the complaint must "approximate . . . the basic elements" of the kind of fraud or violation alleged. *See id.* at *8, *11.

The *Platone* standard was soon after adopted by a number of circuits. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996-97 (9th Cir. 2009); *Welch*, 536 F.3d at 276-77, 279 (4th Cir.); *Allen v. Admin. Rev. Bd.*, F.3d 468, 477 (5th Cir. 2008)); *see also Vodopia v. Koninklijke Philips Elecs., N.V.*, 398 F. App'x 659, 662-63 (2nd Cir. 2010). Some of these courts explicitly based their decision to adopt the standard on deference to the ARB. *See, e.g., Welch*, 536 F.3d at 276,

n.2 (granting *Chevron* deference to the ARB's interpretation of § 1514A); *Van Asdale*, 577 F.3d at 997 ("[W]e similarly defer to the ARB's reasonable interpretation of the statute.").

Although *Platone* addressed what communications were sufficient to qualify as protected activity, circuit courts following *Platone* extended the ARB's reasoning to inform the standard for establishing the objective reasonableness of an employee's belief.  The First Circuit borrowed *Platone*'s language when it announced in *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009) that "[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud."  *See also Allen*, 514 F.3d at 480 n.9 ("the objective reasonableness of the employee's belief is evaluated in part through reference to the elements of a 10b-5 claim"); *Welch*, 536 F.3d at 279 (affirming the dismissal of a whistleblower claim due to the plaintiff's failure to justify the reasonableness of his belief that the company's conduct was fraudulent under the then-existing legal standards governing securities fraud).  *Riddle*, following *Day*, stated that to establish reasonable belief the plaintiff's "theory of [] fraud must at least approximate the basic elements" of the applicable type of fraud.  497 F. App'x at 594-96 (*quoting Day*, 555 F.3d at 55).

The ARB reversed course in 2011 and abrogated *Platone* in *Sylvester v. Parexel Int'l LLC*, ARB Case No. 07-123, 2011 WL 2165854, at *12 (ARB May 25, 2011) (*en banc*). Observing that the requirement that a complaint "definitively and specifically" relate to an enumerated legal violation was drawn from cases arising under the Energy Reorganization Act, 42 U.S.C.A. § 5851, the ARB concluded that such a requirement was "inapposite" in the Sarbanes–Oxley context, and that it also presented "a potential conflict with the express statutory authority of § 1514A, which prohibits a publicly traded company from discharging or in any other manner discriminating against an employee for providing information regarding conduct that the employee "reasonably believes" constitutes a [Sarbanes–Oxley] violation." *Id.* at *14.

The ARB in *Sylvester* also specifically rejected the requirement that a complainant's theory of impropriety must closely imitate the elements of the pertinent fraud.  Such a requirement "merged the elements required to prove a violation of the fraud statute, e.g. materiality and scienter, with the requirements that a whistleblower must allege or prove to

engage in protected activity." *Id.* at *18. The ARB held that such a requirement conflicted with the protections of the statute, which did not require a complainant "to prove a violation of the substantive laws," but merely to have "a reasonable belief of a violation of the enumerated statutes." *Id.* *Sylvester* also emphasized the purpose of § 1514A "to protect and encourage greater disclosure" by exposing existing fraud as well as potentially fraudulent behavior, expressing a concern that "the purposes of the whistleblower protection provision will be thwarted if a complainant must, to engage in protected activity, allege, prove, or approximate" the substantive elements of a given category of fraud. *Id.*

*Sylvester* directed instead that the Sarbanes–Oxley Act's "plain language provides the proper standard for establishing protected activity," *i.e.*, whether the employee "'reasonably believes' that the conduct complained of constitutes a violation of the laws listed at Section 1514[A(a)(1)]." *Id.* at *11. *Sylvester* relied on the established understanding that "reasonable belief" requires a complainant "to have a subjective belief that the complained-of conduct constitutes a violation of relevant law, and also that the belief is objectively reasonable" in light of the factual circumstances, including the "training and experience" of the aggrieved employee. *Id.*

Federal courts have recognized that *Sylvester* casts substantial doubt on the continuing validity of the "definitively and specifically" standard. The Second Circuit in *Nielsen* held the ARB's decision in *Sylvester* was entitled to at least *Skidmore* deference and rejected an earlier unpublished Second Circuit case setting out the "definitively and specifically" standard. *Nielsen*, 762 F.3d at 219 (abrogating *Vodopia*, 398 F. App'x 659, 662-63 (2nd Cir. 2010)); *see also Feldman v. Law Enforcement Ass. Corp.*, 752 F.3d 339, 344 n.5 (4th Cir. 2014) (noting *Sylvester* but not deciding the validity of the "definitively and specifically" standard adopted in *Welch* because it was unnecessary to the disposition of the case); *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1132 n.7 (10th Cir. 2013) (noting *Sylvester* but declining to pass on the appropriate standard for protected activity because plaintiff met the higher "definitively and specifically" standard); *Stewart v. Doral Fin. Corp.*, 997 F. Supp. 2d 129, 135-36 (D.P.R. 2014) (determining that *Day* was no longer good law in light of the ARB's reversal of its position and adopting the *Sylvester* standard). The Third Circuit granted *Chevron* deference to the ARB's

interpretation of § 1514A in *Sylvester* and rejected the "definitively and specifically" standard. *Weist v. Lynch*, 710 F.3d 121, 131 (3rd Cir. 2013).

Indeed, we have not found a decision by a federal court of appeals that considers and rejects the reasoning in *Sylvester*. Defendant emphasizes that the Sixth Circuit decided *Riddle* after *Sylvester*.[4] Def.'s Br. at 20-21. *Riddle*, however, did not discuss *Sylvester*, much less consider and reject its reasoning or analyze whether the ARB's decisions are entitled to deference. *See* 497 F. App'x at 594-96. And, of course, because it is unpublished, it is not precedential. *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011).

## B.          Deference Due to the ARB's Interpretation of § 1514A

The Sixth Circuit has not decided whether the ARB's reasonable interpretations of § 1514A are entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, courts defer to an agency's permissible interpretation of the law if Congress has not spoken to the precise issue by statute. 467 U.S. at 842-43. *Chevron* deference should be applied "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of such authority." *United States v. Mead Corp*, 533 U.S. 218, 226-27 (2001). Agency interpretations not entitled to *Chevron* deference may nonetheless "merit some deference" in light of agency expertise and the value of uniformity in interpreting of the law. *Mead*, 533 U.S. at 234. The deference due in such cases is governed by *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Mead*, 533 U.S. at 238-39 (remanding with instructions for the Federal Circuit to determine whether the customs ruling letters at issue were entitled to deference under *Skidmore*).

Circuits holding that the ARB's decisions interpreting § 1514A are entitled to *Chevron* deference note that the statute expressly provides for adjudication of whistleblower complaints by the Secretary of Labor, who in turn "delegated the authority to review appeals under Section 806 and issue final agency decisions to the ARB." *Weist v. Lynch*, 710 F.3d at 131 (citing

---

[4]Defendant also cites *Ind. Mich. Power Co. v. U.S. Dep't of Labor*, 278 F. App'x 597 (6th Cir. 2008) and *Am. Nuclear Res. v. U.S. Dep't of Labor*, 134 F.3d 1292 (6th Cir. 1998) as embracing the "definitively and specifically" standard—both cases, however, arise under the Energy Reorganization Act. *See* Def.'s Br. at 20-21.

Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 75 Fed. Reg. 3924, 3924-25 (Jan. 25, 2010)); *Welch*, 536 F.3d at 276 n.2 (same); *see also Lockheed*, 717 F.3d at 1131 (granting *Chevron* deference to the ARB's "interpretation of [§ 1514A] as expressed in formal adjudications"). In a recent case construing a different aspect of § 1514A, the Supreme Court declined to decide whether the ARB's interpretations of the statute were entitled *Chevron* deference. *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 n.6 (2014). In her dissent, Justice Sotomayor argued that Congress granted the SEC, rather than the Secretary of Labor, interpretive authority over § 1514A. *Id.* at 1186-87 (Sotomayor, J., dissenting) (arguing that the ARB has not been granted interpretive authority over § 1514A).

The Second Circuit decided *Nielsen* shortly after *Lawson* came down. *See Nielsen*, 762 F.3d at 220 (discussing *Lawson* and lower court decisions granting *Chevron* deference to the ARB). The Second Circuit concluded that *Sylvester*'s rejection of the "definitively and specifically" standard "is persuasive even under lesser *Skidmore* deference" and declined to reach whether the ARB's interpretations of § 1514A were entitled to *Chevron* deference. *Id.* We do the same.

*Skidmore* deference is grounded in the recognition that "the rulings, interpretations, and opinions" of the agency that administers an act "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140. "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* In determining whether an agency's interpretation is persuasive under *Skidmore*, "we look to the statute's text and design, including whether the [interpretation] is consistent with the congressional purpose." *S. Rehab. Grp., PLLC v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 685 (6th Cir. 2013) (citations omitted).

The text and design of § 1514A does not suggest any heightened showing of a factual basis for the suspected fraud. The statute prohibits retaliation for "any lawful act done by the employee . . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a

violation" of the enumerated provisions.  § 1514A(a)(1).  Indeed, at every juncture, the statute sweeps broadly, encompassing a wide swath of acts, limited only by their legality, to provide information or assistance to an investigation "regarding any conduct" reasonably believed by the employee to constitute a violation of relevant law.  *See id.*

The well-established intent of Congress supports a broad reading of the statute's protections.  The Sarbanes–Oxley Act was enacted in 2002, in the wake of the Enron scandal, to "prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions."  S. Rep. No. 107-146, 2002 WL 863249, at *2 (2002), *quoted in Lawson*, 134 S.Ct. at 1162.  In particular, Congress sought to counteract the "corporate code of silence" resulting from practices that discouraged employees from reporting fraud "not only to the proper authorities . . . but even internally," finding that such practices had allowed Enron's fraudulent accounting practices to flourish in a climate of impunity.  *Id.*  The whistleblower provisions of the Act address this concern, and were drafted broadly for that purpose.  *Lawson*, 134 S.Ct. at 1163.  "The legislative history of Sarbanes–Oxley makes clear that its [whistleblower] protections were 'intended to include all good faith and reasonable reporting of fraud, and [that] there should be no presumption that reporting is otherwise, absent specific evidence.'"  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1002 (9th Cir. 2009) (quoting 148 Cong. Rec. S7418–01, S7420 (daily ed. July 26, 2002) (statement of Sen. Leahy) (second edit in original)).

We agree with the ARB that an interpretation demanding a rigidly segmented factual showing justifying the employee's suspicion undermines this purpose and conflicts with the statutory design, which turns on employees' reasonable belief rather than requiring them to ultimately substantiate their allegations.  *Sylvester*, 2011 WL 2165854, at *18; *see also id.* at *17 ("[T]he critical focus [of § 1514A] is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law.").  As the Second Circuit cogently reasoned,

> [R]elief pursuant to § 1514A turns on the reasonableness of the employee's belief that the conduct violated one of the enumerated provisions—which is contrary to the "definitively and specifically" standard. The objective prong of the reasonable belief test focuses on the basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience. Many employees

are unlikely to be trained to recognize legally actionable conduct by their employers. Accordingly, the centrality of the belief of the whistleblower that her employer has engaged in wrongdoing leads us to conclude, in accord with the ARB's interpretation in *Sylvester*, that the "definitively and specifically" requirement is not in keeping with the language of the statute.

*Nielsen*, 762 F.3d at 221 (citation and quotation marks omitted).

We agree with this analysis. Even *Platone*'s more modest requirement that an employee's communications "definitively and specifically" relate to a category enumerated under the statute has the strong potential to defeat claims where a lay person, not familiar with the niceties of federal securities law, reports something he or she reasonably believes to be illegal but omits reference to the type of violation or fails to approximate each of its elements. *See Platone*, 2006 WL 3246910 at \*11. The cases that extended *Platone* to address the employee's reasonable belief, including the basis for the belief, necessarily sharpened this conflict. *See Day*, 555 F.3d at 55, *quoted in Riddle*, 497 F. App'x at 594-96. We agree with the Third Circuit that an employee "should not be unprotected from reprisal because she did not have access to information sufficient to form an objectively reasonable belief that there was an intent to defraud or [that] the information communicated to her supervisor was material to a shareholder's decision." *Wiest*, 710 F.3d at 132. An interpretation of § 1514A that would leave such an employee without protection is inconsistent with the statutory design and well-established Congressional intent.

We therefore adopt as persuasive the reasoning of the ARB in *Sylvester* and reject the "definitively and specifically" standard applied in this Court's previous unpublished opinion of *Riddle v. First Tenn. Bank, Nat'l Ass'n*, 497 F. App'x 588, 595 (6th Cir. 2012).

### C.    Reasonable Belief

We agree with the ARB that the statute's "plain language provides the proper standard for establishing protected activity." *Sylvester*, 2011 WL 2165854 at \*11. Namely, to sustain a complaint based on protected activity under § 1514A, "the complainant need only show that he or she 'reasonably believes' that the conduct complained of constitutes a violation" of the enumerated laws. *Id.* As the term itself indicates, reasonable belief involves both a subjective component and an objective component. *Nielsen*, 762 F.3d at 221. The subjective component is

satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law. *Id.* "Objective reasonableness 'is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'" *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009) (quoting *Allen*, 514 F.3d at 477).

Thus, the inquiry into whether an employee had a reasonable belief is necessarily fact-dependent, varying with the circumstances of the case. For this reason, "[t]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation" or otherwise justified the employee's belief that illegal conduct was occurring. *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 361 (4th Cir. 2008) (Michael, J., dissenting) *quoted in Sylvester*, 2011 WL 2165854 at \*12. If, on the other hand, "reasonable minds could disagree about whether the employee's belief was objectively reasonable, the issue cannot be decided as a matter of law." *Id.* In accordance with our discussion above, an employee need not establish the reasonableness of his or her belief as to each element of the violation. Instead, the reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience. *See id*; *Weist*, 710 F.3d at 135 (applying the *Sylvester* reasonable belief standard).

## II.     Application to Rhinehimer

Applying the proper legal standard for protected activity under § 1514A, we conclude that the evidence submitted in this case was more than adequate to sustain the judgment that Plaintiff possessed an objectively reasonable belief that Harrigan's conduct with regard to the contested trades constituted unsuitability fraud. Consistent with the standard of review for motions for judgment as a matter of law under Rule 50(b), we give Plaintiff, the nonmoving party, "the benefit of all reasonable inferences." *Barnes*, 401 F.3d at 736.

Plaintiff knew the structure of Purcell's long-held estate plans, and learned of trades that a reasonable investment professional (and particularly one with Plaintiff's training and experience) would recognize as inconsistent with those plans. Indeed, as Plaintiff explained, he understood that the trades changed how the affected funds were titled and how they would be

distributed upon Plaintiff's death, including whether they would be exposed to probate. Plaintiff was also well aware of Purcell's relative vulnerability as an elderly man with increasingly diminished faculties, and he was familiar with Harrigan's incentives to place the trades and with USBII's past efforts to encourage Purcell to invest the funds in his trust account so that the bank would earn more money. Viewing the evidence in the light most favorable to Plaintiff, we must also assume that Harrigan placed the contested trades after a phone call in which Plaintiff warned Harrigan of Purcell's diminished capacity and asked Harrigan not to make any trades for Purcell.

Based on the totality of these circumstances, the evidence was more than sufficient to sustain the jury's finding that Plaintiff reasonably believed that the trades constituted unsuitability fraud. Although it is true that Plaintiff had no specific knowledge of whether Harrigan had omitted or misrepresented material information in his communications with Purcell, much less any knowledge of whether Harrigan did so intentionally or with reckless disregard, these gaps in Plaintiff's knowledge are immaterial. Even if, in fact, everything about the trades were above board, courts universally recognize that § 1514A protects employees who reasonably but mistakenly believe that the conduct at issue constitutes a violation of relevant law. *See, e.g.*, *Wiest v. Lynch*, 710 F.3d 121, 132 (3d Cir. 2013) ("Congress chose statutory language which ensures that 'an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories . . . is protected." (citation omitted)); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009) (same); *Welch v. Chao*, 536 F.3d 269, 277 (4th Cir. 2008) (same); *Allen v. Admin. Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008) (same). The information that was available to Plaintiff was more than adequate to allow him reasonably to believe that the trades were the result of conduct constituting unsuitability fraud. When USBII retaliated against him for reporting that information, it therefore violated Sarbanes–Oxley's whistleblower protections.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.