NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0453n.06

Case No. 16-5334

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Aug 02, 2017

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| EDWARD E. VEARD, JR., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| F&M BANK, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: BOGGS, SILER, and DONALD, Circuit Judges.

**SILER**, Circuit Judge. Edward E. Veard, Jr., filed a claim for retaliatory discharge under the Consumer Financial Protection Act ("CFPA"), and he now appeals from the district court's grant of summary judgment in favor of F&M Bank. For the following reasons, we affirm the district court's decision.

## I.

Veard worked as a Mortgage Loan Originator ("MLO") for the Hendersonville, Tennessee, branch of F&M Bank, and was an at-will employee. He reported to Branch Manager Brian Maggart, who reported to the Mortgage Department's Operations Manager, Denise Alexander. Alexander reported to Chief Financial Officer DeWayne Olive. Amanda Dean was the Mortgage Department's Compliance Officer.

As an MLO, Veard was essentially a salesman for the mortgage team and was paid a commission for the loans he originated and F&M closed. As part of that process, he was responsible for originating loans and securing documentation from the loan customer, at which point he would submit the file to a Loan Processor. The Loan Processor would conduct due diligence and send the file to an Underwriter for a decision.

In November 2013, Veard assisted a husband and wife, the Smiths, with a loan application.[1] Veard thought the loan should be approved and passed the file to a loan processor, who in turn sent it to underwriter Kelly Pachachi, who conditionally approved the loan request. Pachachi was concerned that the Smiths had reported a cancellation of debt on their personal tax returns. Pachachi eventually determined that the cancellation of debt was due to the husband's 20% ownership in his family's Limited Liability Company ("LLC"), which had defaulted on a $3.6 million property loan, and the property was subject to foreclosure. The Smiths received a tax benefit from the LLC's default.

Veard disagreed with Pachachi's assessment that the default affected the risk of loaning to the Smiths. He argued that the Smiths should not be liable because the LLC, not the Smiths, was the borrower on the foreclosed property. Veard, Maggart, and Alexander also received additional information from the Smiths' CPA and other tax specialists indicating that the Smiths had strong credit with no delinquencies. In light of this, Veard disputed F&M's decision that the cancellation of debt made the Smiths an unacceptable credit risk and averred that F&M was denying the loan for a false and inaccurate reason.

Around this time, Maggart had Veard send the Smiths' loan to JP Morgan Chase Bank ("Chase") to see if it would purchase the loan. Although Chase originally advised that it would

---

[1] Due to federal privacy laws, the parties use the fictitious name "Smith" to protect the identity of the borrowers.

purchase the loan, it changed its mind after Alexander informed Chase of an IRS Form 1099, which she believed indicated that Mr. Smith was personally responsible for the foreclosure because he was a 20% owner of the LLC and because he reported the default on his tax return. After consulting with Maggart, Veard then advised David Thomas, F&M's Director of Credit Administration, about the situation. Veard stated that he had consulted an attorney, who had said that the foreclosure was not against the Smiths personally, as they were not obligated on the loan. Later that evening, Veard emailed Alexander and asked for the reason for the denial of the loan; he stated that if the reason was the foreclosure, then that reason did not exist.

The next day, Alexander sent an email to Veard, Maggart, and Pachachi, stating that "[i]f our borrower was not responsible [for the foreclosure] it would not have been on his tax return. I am not discussing this again. Do NOT email David Thomas." Alexander testified in deposition that she intended this email to put Veard on notice to stop pursuing the Smith loan; however, Alexander does admit that Veard, Maggart, and Pachachi continued to discuss the loan after the email. In the weeks after her email stating that this file was no longer open for discussion, Alexander, herself, told Mr. Smith that she would submit the file to U.S. Bank for review, and that if they approved a loan, likely lower than the one originally requested, F&M would close the loan.

Even after the loan was officially denied in December, Veard continued to pursue the loan and suggested that F&M not disclose to Chase the tax returns showing the cancellation of debt. Alexander responded, "Ed, we have knowledge so we are not ignoring." Veard then claims that he met with Dean and raised several questions about F&M's practices. Although Dean denies the conversation, Veard contends that he followed up on an earlier question about sending out Adverse Action Notices and stated that "[we] could be liable and I don't want to be

liable for this. I mean, this is something that we should be doing and if we're supposed to be doing it, we need to be told."[2] Veard also stated in deposition that he complained about what he believed was the false and inaccurate reason that Alexander denied the Smiths' loan.

In January 2014, in response to a request from Mr. Smith and without Alexander's knowledge, Veard created a new loan file and submitted the loan documents from the Smiths' 2013 denied file to U.S. Bank. Using white-out, Veard also altered an IRS form that the Smiths had signed in November 2013 to change the date of the submission of the file to comply with U.S. Bank guidelines. Smith agrees that he never received express authorization to submit the file, but he claims that Maggart knew he was submitting the file and did not stop him from doing so; however, Alexander had no knowledge of the file upload. That evening, Alexander learned from Maggart that Veard had uploaded the file, and the next morning, she emailed Olive about the issue as she was concerned the file upload could affect the bank's bonding and insurance. The email explained the timeline of the Smith file, including Alexander's directive not to discuss the application again, Veard's continued communication with investors and others in the office, and her concerns about this behavior. Alexander worried that due to his "desperate personality," Veard was becoming a "lender liability" that F&M could not control. Alexander then contacted U.S. Bank to alert them that the Smith file had not proceeded through normal F&M channels and should be cancelled.

Alexander later told Olive about what she perceived to be insubordinate actions by Veard regarding the Smiths' loan file, including its submission to U.S. Bank. Alexander told Olive that Veard would not accept her decision on the file and had continued to work on the file after being told not to do so. At the end of the conversation both Alexander and Olive believed that Veard's

---

[2] In fall 2013, Veard had spoken with Dean and Alexander about whether F&M should send out Adverse Action Notices and what would happen if it had not been doing so. Dean said that F&M was "supposed to be" sending the notices, and Alexander said "it wouldn't be good" if F&M had not been mailing the notices.

conduct was insubordinate and the file upload could hurt F&M's bonding coverage. After speaking to management in HR and with Maggart to get his perspective on the situation, Olive terminated Veard in January 2014.

In July 2014, Veard filed an administrative complaint with the Occupational Safety and Health Administration ("OSHA"), alleging a claim under the CFPA. OSHA did not issue a final determination within 210 days, so, in April 2015, Veard filed a complaint in federal court, claiming retaliation under the CFPA and Tennessee common law. The district court granted summary judgment in favor of F&M, and Veard appealed the court's decision regarding his CFPA claim.[3]

## II.

We review a district court's grant of summary judgment de novo. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The relevant provision of the CFPA under which this retaliation claim was brought provides as follows:

> No covered person or service provider shall terminate . . . any covered employee . . . by reason of the fact that such employee . . . [has] provided, caused to be provided, or is about to provide or cause to be provided, information to the employer . . . relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, any provision of this title or any other provision of law that is subject to the jurisdiction of the Bureau, . . . [or] objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee . . . reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the Bureau.

12 U.S.C. § 5567(a).

---

[3] Veard has abandoned his common-law claim on appeal.

In order to establish a prima facie case of retaliation under the CFPA, Veard has the burden of "showing that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint." *Id.* § 5567(c)(3)(A). If he makes out a successful prima facie case, F&M must demonstrate by clear and convincing evidence "that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.* § 5567(c)(3)(B).

The prima facie elements that Veard must establish are that "(1) he engaged in protected activity; (2) the employer knew or suspected, either actually or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 805 (6th Cir. 2015).[4] The district court found that Veard failed to meet the first element as he did not engage in a protected activity under the CFPA. It then found that even if Veard made out a prima facie case, his claim would still fail as F&M offered clear and convincing evidence that it would have terminated his employment in the absence of any protected activity.

**A.**

The first question we must address is whether Veard engaged in protected activity under the statute. Veard alleges that his conduct with regard to both the Adverse Action Notices and the Smiths' loan qualifies as protected activity.

**1.**

At a meeting in 2013, Veard asked if F&M was supposed to be mailing Adverse Action Notices, and Dean replied in the affirmative. Veard later asked Alexander what would happen if

---

[4] "There are variations . . . [of types of retaliation claims], but the essential framework remains the same." *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th Cir. 1999) (en banc). Thus, we apply the same four-part framework in the CFPA, although it is a relatively new statute.

the notices were not mailed, and Alexander responded that "it wouldn't be good." Veard alleges that he spoke to Dean again, although Dean denies this conversation, and stated that "[w]e could be liable [for failing to mail the notices] and I don't want to be liable for this." He also claims he mentioned contacting an attorney. During his deposition, when Veard was asked why he thought the conversation with Dean should be interpreted as protected opposition versus simply asking questions, he replied, "I guess just the way I presented the question or the way I was questioning it was that we were wrong, that we need to get the attorney involved because this is not right."

This does not rise to the level of protected activity. Veard argues that the district court erred because Veard was not required to report the alleged wrongful conduct to any particular person or to someone outside of F&M Bank and that his discussion with Alexander and Dean should qualify as protected activity. The problem, however, is not that Veard failed to report the issue to someone outside the bank, but that he did not oppose any failure to send the notices; he merely asked questions. Talking to Dean and Alexander about the Adverse Action Notices appears to be no more than seeking confirmation and clarification of what he should do in the future, not an objection to behavior he deemed unlawful. Veard's assertion that the way he presented the question to Dean was enough to convey opposition does not support his contention that his actions were protected. Veard is not alleging that F&M instructed MLOs not to send the notices, and, in fact, his conversations confirmed that Alexander and Dean knew notices should be sent and that there could be problems if the notices were not mailed. Accordingly, the district court did not err when finding that Veard's actions regarding the Adverse Action Notices were not a protected activity.

**2.**

As to Veard's actions regarding the Smiths' loan, the district court found that Veard failed to show that his complaints and discussions with F&M management were protected activities. Under the statute, Veard must prove that he reasonably believed the actions of F&M violated the law. 12 U.S.C. § 5567(a). Reasonable belief requires both a subjective and objective component. That is, Veard must show that he actually believed F&M's conduct violated the CFPA and that a reasonable person in his position would have believed F&M violated the act. *See Rhinehimer*, 787 F.3d at 811.

The district court first found that based on the record Veard subjectively believed F&M was violating the CFPA based on its handling of the Smiths' loan. Neither party challenges this finding. However, the district court then found that Veard's belief was not objectively reasonable, as "a reasonable MLO could not have believed that the facts known to Veard concerning the Smiths' loan amounted to a violation of the [CFPA] or otherwise justified his belief that illegal conduct was occurring." *Rhinehimer* discussed the issue of determining an objective belief as follows:

> [T]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring. If, on the other hand, reasonable minds could disagree about whether the employee's belief was objectively reasonable, the issue cannot be decided as a matter of law. . . . [T]he reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience.

787 F.3d at 811–12 (internal citations and quotation marks omitted).

Veard now argues that he presented evidence from which a jury could find that a reasonable MLO would have believed that Alexander denied the Smiths' loan for a false and

misleading reason. The record shows that the Smiths claimed a cancellation of debt on their personal tax return, and Veard testified that the Smiths received a tax benefit related to the foreclosure of the LLC for which the husband was a 20% owner. The question F&M was trying to decide was how risky it would be to lend money to the Smiths, based on this foreclosure. Even though Mr. Smith was only a minority owner of the LLC and not a guarantor on the loan, the LLC had experienced a multi-million dollar default that was claimed on the Smiths' tax return. Veard fails to cite any law that shows F&M could not consider the foreclosure when making its decision,[5] and as the district court pointed out, Veard's deposition shows a "singular, unreasonable focus" on closing the Smiths' loan such that he failed to consider the situation objectively, including that other financial institutions also thought the Smiths posed a credit risk. Even if F&M's discretionary decision to deny the loan was based on a misunderstanding of tax law or policy, Veard fails to show that an objectively reasonable MLO would consider relying negatively on a multi-million default claimed on a personal tax return to be a misleading or false reason to deny a loan. Just because Veard disagreed with F&M's decision does not mean that F&M's actions were unlawful under the CFPA. As such, Veard fails to make out a prima facie case.

**AFFIRMED**.

---

[5] In fact, the Equal Credit Opportunity Act states that a creditor may "consider any information obtained" when deciding whether to make a loan, so long as the information is not used to discriminate on a prohibited basis. 12 C.F.R. § 202.6(a).